LáRAmoRe, Judge,
delivered tbe opinion of the court:
Plaintiff sues for retirement pay under the Career Compensation Act of 1949, 63 Stat. 802, 816, for permanent disability incurred in active military service as an officer of the Army of the United States.
The Department of the Army found that plaintiff was permanently disabled for active service by reason of syrin-gomyelia, but that the disability was not incurred in line of duty, the condition having preexisted plaintiff’s entry into active duty and not having been aggravated thereby.
The sole issue in this case is whether plaintiff’s disability was incurred in line of duty.
Briefly stated the facts show that plaintiff was given a medical examination on October 20, 1954, by the Army, to determine his physical qualifications.
The only notes appearing in the report of his physical examination were:
(1) Sinusitis — severe in hay fever season. User of allergy shots — hay fever severe in season.
(2) Asthma, mild — attack over two (2) years ago— associated with pain in chest.
(3) Shortness of breath with climbing. Nondisabling.
(4) Uses back brace for support. No history of injury.
Plaintiff’s defects and diagnoses were summarized as “No significant abnormalities.”
Plaintiff entered upon active duty as a Captain, Dental Corps, Army of the United States, on March 31, 1955.
Prior to entrance on active duty, plaintiff experienced no abnormal symptoms. He had carried on a successful dental practice and worked as high as ten hours per day without difficulty. He experienced no difficulty in his 6-week orientation course. He expended considerable physical effort in moving his family from New York to Camp Hill and in preparing a garden at Camp Hill. At Camp Hill, shortly thereafter, in the middle of May 1955, he began experiencing difficulty in manipulating his dental instruments. This continued and his condition became worse and plaintiff was admitted to the hospital in June 1955. He remained in the hospital and on June 17, 1955 his condition was diagnosed as “syringomyelia, early.”
*422 A medical board at Walter Reed Hospital found plaintiff incapacitated for military duty on June 20, 1955; that the incapacity originated in May 1955; that the cause of the incapacity was incident to the service and did not exist prior to his entry on active duty; that the incapacity was permanent ; that plaintiff was not qualified for any military service; that plaintiff’s condition was “Syringomyelia of cervico-thoracic cord.”
A physical evaluation board confirmed the diagnosis but found the disease existed prior to his term of service.
On August 8,1955, plaintiff submitted a rebuttal statement to the findings of the physical evaluation board which contained citations of many medical authorities that the etiology of Syringomyelia is unknown and that there are many conflicting theories as to its causes and that the finding that the condition preexisted his entry into active duty was speculative.
The proceedings were, on order of the Adjutant General, returned to the physical evaluation board for reconsideration of the line-of-duty determination. Upon request of the physical evaluation board the president of the medical board responded as follows :
_ a. The statement of the Medical Board that the patient was inducted into the Army Dental Corps 20 October 1954 is in error. However, the staff was well aware that such date represented the time of his active duty medical evaluation while he was with the National Guard, and that his actual active duty dated from only 31 March 1955.
b. In view of there no longer being regulations defining set periods of active duty as to whether or not a disease entity will be considered LOD Yes or No, it has been our policy to record such in terms of best currently acceptable medical opinion. In this individual’s case although many would feel his basic degenerative process had its onset long before service, and perhaps justly so, the actual etiology and mode of onset of syringo-myelia are unknown. In view of this, the conflicting theories as to time intervals of progression, the vagaries from case to case, and the patient’s prior recorded normal findings, indicated to us that absolute categoric statements could not be made, that more than reasonable doubt existed in favor of the patient, and the LOD Yes determination rendered.
*423 On September 28, 1955, the physical evaluation board reconvened and after brief consideration of the case reiterated its previous findings. On October 5, 1955, the Army Physical Review Council, reviewing the physical evaluation board’s proceedings, requested the Surgeon General to make a line-of-duty determination in plaintiff’s case. The Surgeon General replied as follows:
1. The Surgeon General agrees that the diagnosis of syringomyelia is the most likely diagnosis in the case of Captain Sheppard M. Siegel, Dental Corps, 02264474.
2. The cause of syringomyelia is unknown. Sy-ringomyelia is usually considered to have a slow and insidious onset. The Surgeon General considers it unlikely that the disease could have had its onset and readied the present stage, or that it was aggravated as a result of military service, during the brief period of active duty. It is the medical judgment of The Surgeon General that the condition should be considered as having existed prior to entry on active service.
3. Captain Siegel has indicated to the neurologist at the Walter Reed Army Hospital that he carried “professional disability insurance” until he entered the Army, at which time he sold his dental practice and dropped the “professional disability insurance.” The action of Captain Siegel in dropping this “disability-insurance” suggests to The Surgeon General that this officer had no knowledge that the present disease process was known at the time of entry on active duty. Examining authorities did not discover signs or symptoms suggestive of the disease on 20 October 1954, when he had a physical examination incident to applying for a commission. The disease process was not discovered during the first six weeks of his military duty while a student at the Medical Field Service School, Fort Sam Houston, Texas, although in retrospect certain symptoms were manifested at that time which are probably related to the disease process. In order to give the case of Captain Siegel every consideration, The Surgeon General recommends that his case be referred to The Judge Advocate General for an opinion of line of duty inasmuch as considerations specified in AR 600-140 to refute a presumption of line of duty may supersede the medical judgment of The Surgeon General.
Army Regulation 600-140, dated February 12, 1953, provides in part as follows:
*424 c. [paragraph. 1] Presumptions. — Injury, disease, or death incurred by a member of the Army while on active duty, active duty for training, or during inactive-duty training, or by a cadet at the United States Military Academy, or by a member of the advanced course E.OTC attending a summer camp will be presumed to have been incurred in line of duty and not because of the member’s own misconduct.
d. Evidence required to rebut presumptions.
(1) Line of duty. — The presumption favoring line of duty may be overcome only by substantial evidence that the injury, disease, or death, or condition causing injury, disease, or death—
(a) Was proximately caused by the intentional misconduct or willful neglect of the individual (par. 2a).
(b) Occurred during a period of unauthorized absence (par. 25).
(c) Was contracted or incurred while neither on active duty nor engaged in authorized training in an active- or inactive-duty status and was not aggravated by the service (par. 2c).
* * * * *
e. Nature of evidence tobe considered in line-of-duty and misconduct determinations. — In general, any evidence may be considered in making line-of-duty and misconduct determinations, with the exception that any written signed statement of a person in the Armed Forces, against his interest, relating to the origin, incur-rence, or aggravation of any injury or disease suffered by him, may not be considered in making determinations as to such injury or disease, unless he has first been advised that he need not make such a statement and also has been advised of his rights under the Uniform Code of Military Justice, Article 31 (b).
*****
c. _ [paragraph 2] * * * Irrespective of length of service, a member of the Army will be presumed to have been in sound physical and mental condition upon entering active service or authorized training in an active- or inactive-duty status. In order to overcome this presumption, it must be shown by substantial evidence that the injury, disease, or death, or condition causing injury, disease, or death was sustained or contracted while the individual was neither on active duty nor engaged in authorized training in an active- or inactive-duty status. Further, even if the foregoing presumption is overcome by such evidence, it is presumed that any additional dis *425 ability or death, resulting from the preexisting injury, disease, or condition was caused by service aggravation thereof. Only specific findings of “natural progress” of the preexisting injury, disease, or condition, based upon well established medical principles, as distinguished from medical judgment alone, are sufficient to overcome the presumption of service aggravation. * * *.
(1) Presumption of sound condition. — Medical judgment alone, as distinguished from well established medical principles, will not be considered the “substantial evidence” required to rebut the presumption of a member of the Army’s sound condition at the time of his entrance into active military service. However, manifestation of lesions or symptoms of chronic disease, so close to the date of the patient’s entry into active service that could not have originated after such entry, constitute “substantial evidence” that the disease existed prior to the entry. Likewise, manifestation of disease within less than the required minimum incubation period after the patient’s entry into active service will be “substantial evidence” of inception prior to the service.
(2) Service aggravated condition. — Any increase in disability during active service resulting from a condition that existed prior to the active service will be presumed to have been service-aggravated, unless it can be proved otherwise on the basis of well established medical principles. Medical or surgical treatment furnished during service for preexisting conditions does not of itself establish service aggravation. Mere recurrences of certain diseases within a short period after the patient’s entrance into active service such as epileptic seizures, seasonal asthma, recurrent dislocations, etc., do not establish service aggravation. Also, incapacitating defects due to certain diseases, such as neoplasms, most endoctrine disturbances, epilepsy, arteriosclerosis, and arthritis, and other chronic and degenerative diseases in which the onset is insidious and progress is slow, are of themselves not evidence of increased disability. Unless there was some pertinent local injury, or an abrupt and sudden pathological development during active service, such incapacitating defects may arise as a natural consequence of preexisting conditions, and not be incident to or aggravated by service. Acute infections such as pneumonia, *426 active rheumatic fever (even though recurrent), acute pleurisy, acute ear disease, and sudden developments, as hemoptysis, lung collapse, perforating ulcer, decompensating heart disease, coronary occlusion, or thrombosis or cerebral hemorrhage, occurring while in service will be regarded as service-incurred or service-aggravated, unless it can be clearly and unmistakably shown that there was no increase in severity during active service.
On October 13, 1955, in accordance with the suggestion of the Surgeon General’s Office, the Army Physical Review Council requested an opinion of the Judge Advocate General on line of duty.. On October 31,1955, the Judge Advocate General rendered his opinion as follows :
1. Reference is made to your memorandum for The Judge Advocate General, subject as above, dated 13 October 1955, in which you request an opinion whether the disease of Captain Sheppard M. Siegel should be regarded as having been incurred in line of duty.
2. In cases of this type the presumption favoring line of duty can be overcome only by substantial evidence that the disease existed prior to the individual’s entry into the service and was not service aggravated (sub-par. ld(l)c, AR 600-140, 12 Feb. 1953), In addition, in order to provide the substantial evidence necessary to overcome the presumption that the disease was aggravated by the member’s service (subpar. 2c(2), AR 600-140, supra), specific findings must be made, “based upon well established medical principles, as distinguished from medical judgment alone,” that the preexisting disease naturally progressed during the member’s service (subpar. 2c, AR 600-140, supra).
3. In Disposition Form Comment No. 2 (MEDDP 201 Siegel, Sheppard M. (0)), subject: “Review of Physical Evaluation Board Proceedings”, dated 10 October 1955, The Surgeon General states that the cause of syringomyelia is unknown but that it is unlikely that the disease could have had its onset and reached its present stage, or that it was aggravated, as a result of military service. The mentioned comment does not of necessity establish that the conditions responsible for Captain Siegel’s disease existed prior to his entry into the service. Furthermore, from the statements made it appears that there are no well established medical principles with regard to the disease of syringomyelia and *427 that the views propounded by The Surgeon General constitute an expression of his medical judgment rather than an opinion based on established principles. In view of the foregoing, it is the opinion of this office that there is not sufficient evidence in the file to establish that the disease existed prior to the member’s entry into the service nor is there sufficient evidence to overcome the presumption of service aggravation.
The members of the Physical Review Council, being in disagreement as to the line-of-duty finding, referred the case to the Army Physical Disability Appeal Board on November 9, 1955. While the Physical Review Council submitted to the Board the conflicting views of the Surgeon General’s representative, the G-l (Assistant Chief of Staff) representative and the Judge Advocate General’s representative on the Council, it did not send to the Board the statement of the Surgeon General that his opinion was based upon medical judgment alone and might be superseded by AR 600-140, or the opinion of the Judge Advocate General that the medical opinion and other evidence were not sufficient to rebut the presumption established by the regulation.
On November 15, 1955, the Army Physical Disability Appeal Board concurred in the findings of the physical evaluation board and recomended that plaintiff be separated from the service because of physical disability that existed prior to service. Accordingly, on November 23,1955, plaintiff was released from active duty by reason of physical disability.
Army Regulation 15-160, dated August 20, 1953, relating to the procedures of the Army Physical Review Council and Army Physical Disability Appeal Board, provided as follows:
6. Basis for determinations. — The members of the Council will be guided by the law, and applicable regulations, principles, rules, and precedents established by Department of the Army, including medical standards as to fitness or unfitness stated by The Surgeon General, and legal opinions rendered and legal principles established by the Judge Advocate General.
^ Hi ❖ H« ❖
12. Basis for determinations. — The members o>f the Appeal Board will be guided by the law, and applicable *428 regulations, principles, rules, and precedents established by the Department of the Army, including medical standards as to fitness or unfitness stated by The Surgeon General, and legal opinions rendered and legal principles established by The Judge Advocate General.
Army Regulation 635-40B, dated June 28, 1955, entitled “Personnel Separations — Physical Evaluation for Retention, Separation, Or Retirement,” paragraph 25-a(5) provided:
* * * In determining whether the disability of a member was incurred prior to entrance into service, and, if so, whether it was aggravated thereby, the principles set out in AR 600-140 will be followed.[1]
In view of the uncertainty of the etiology of syringomyelia, the many conflicting theories, the complete lack of definite knowledge with respect to the time intervals between onset and symptoms, it is impossible to state on any well-established medical principles, as required by Army regulations, that plaintiff’s condition preexisted his entry into the service. If plaintiff’s condition originated prior to active military service, it is likewise impossible to state on well-established medical principles, as required by Army regulations, that it was not aggravated as a result of military service. The conclusion of the physical evaluation board that the condition preexisted plaintiff’s military service appears to be based entirely on medical judgment. The defendant’s medical witness, who subscribed to the congenital theory, admitted that he reached this conclusion on the basis of medical judgment. The conclusion of the medical board that plaintiff incurred the disease in line of duty was based upon the fact that there were no sound medical principles upon which it could be found that plaintiff’s disease originated prior to his entry into the service and that such a finding would be purely theoretical.
In finding that the plaintiff’s condition existed prior to his entry into the military service, the Physical Review Council and the Army Physical Disability Appeal Board did not follow the legal opinion of the Judge Advocate General that such a finding could not be made upon the evidence under Army Regulation 600-140, February 12,1953.
*429 Under the Veterans Administration Schedule for Eating Disabilities, plaintiff’s conditions could be rated as 80 percent disabling, in a combined rating based upon the findings of the medical board and physical evaluation board. In applying the applicable schedule, the Judge Advocate General reached the same rating evaluation, i.e., a combined rating of 80 percent.
Therefore, in the opinion of the court, it is patently clear that the presumption that plaintiff’s disease was incurred in the line of duty was not overcome by substantial evidence as required by AE 600-140, quoted above, which has the force and effect of law and cannot be departed therefrom. Ex parte Reed, 100 U.S. 13; Spencer v. United States, 121 C. Cls. 558; Prichard v. United States, 138 C. Cls. 212. It results that the decision of the physical evaluation board and the decision of the Physical Eeview Council affirming the physical evaluation board was erroneous in law.
Plaintiff is therefore entitled to recover, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Eule 38 (c) of the Eules of this court.
It is so ordered.
Eeed, Justice (Ret.), sitting by designation; Littleton, Judge (Ret.); Madden, Judge; and Jones, Ohief Judge, concur.
Whitaker, Judge, took no part in the consideration and decision of this case.
FINDINGS OP FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff was born January 30,1928, in New York City, and is a citizen of the United States. He was commissioned in the National Guard on June 2, 1952, and entered upon active duty as a Captain, Dental Corps, Army of the United States, March 31,1955.
2. On October 20, 1954, plaintiff was given a medical examination by the Army to determine his physical qualification for entry on active duty, at which time he was found *430 to be physically qualified for general military service. The only notes appearing in the report of his physical examination were:
(1) Sinusitis — severe in hay fever season. User of allergy shots — hay fever severe in season.
(2) Asthma, mild — last attack over two (2) years ago— associated with pain in chest.
(3) Shortness of breath with climbing. Nondisabling.
(4) Uses back brace for support. No history of injury.
The report showed that he was normal in all clinical evaluations ; the physical profile is “1” throughout and the physical category “A”. Under the profile system, an officer is rated for his general physical condition, upper extremities, lower extremities, hearing, eyes, and neuropsychiatry and the results are shown under the letter symbols of “p,” “u,” “1,” “h,” “e,” and “s.” The ratings under each of these symbols are from “1” to “4.” The “1” indicates no defect; “4,” nonacceptable defects; “2” and “3” are in between the two extremes. There were no defects noted in plaintiff’s upper or lower extremities, musculoskeletal, or neurological systems. Plaintiff’s defects and diagnoses were summarized as “No significant abnormalities.”
3. Although plaintiff had been wearing a back brace since 1951, he discontinued its use at the time of his entry on active duty. He also had a condition known as “scoliosis” (curvature of the spine) for as long as he could remember. No particular significance was placed on the condition of scoliosis by the Physical Evaluation Board, although in many cases of syringomyelia, which is involved in this claim, such condition antedates other clinical signs.
4 Prior to entrance upon active duty on March 31, 1955, plaintiff had experienced no abnormal symptoms. In private dental practice he performed all duties of a six-day, busy schedule, sometimes ten hours per day, without difficulty. He had carried disability insurance in a large sum, warranted by his $30,000 annual dental practice, which he cancelled at the time he entered active military service. Pie experienced no difficulty with his six-week orientation at Fort Sam Houston, including infiltration and rifle courses. When he was transferred to Camp Hill, Virginia, about the *431 middle of May 1955, he expended considerable physical effort in moving his family from New York to Camp Hill and in digging, rooting, and otherwise preparing a garden, all without any sense of weakness or stiffness in his upper extremities.
5. At Camp Hill plaintiff, for the first time, resumed Ms practice of dentistry after entering military service, and during the middle of May 1955 he began to notice difficulty in manipulating his dental instruments. Subsequently, symptoms in Ms hands and arms developed in rapid succession, including loss of strength, loss of mobility, stiffness, and loss of temperature and pain sensation.
6. Because of the symptoms experienced, plaintiff had outpatient treatment at Fort Belvoir Army Hospital on June Y, 1955, and on June 15 was admitted to that hospital for specialized treatment. On June 1Y, 1955, his condition was diagnosed as “syringomyelia, early.” He remained at this hospital one day, after which he was transferred to Walter Reed Army Hospital.
Y. On July 2Y, 1955, a Medical Board at Walter Reed, consisting of two neurologists and one internist, of which Lt. Col. James F. Hammill, CMef of the Neurological Service at Walter Reed, was president, found that plaintiff became incapacitated for military duty on June 20, 1955; that the incapacity originated in May 1955; that the cause of the incapacity was incident to the service and did not exist prior to his entry into active duty; that the incapacity was permanent ; that plaintiff was not qualified for any military service; and that plaintiff’s condition was “Syringomyelia of cervicothoracic cord.”
8. Plaintiff was admitted to the Walter Reed Army Hospital, Washington, D.C., on June 20, 1955, for medical observation by a neurologist. Following an extended period of observation and many cliMcal tests, plaintiff’s condition was diagnosed as “Syringomyelia of cervicothoracic cord,” with a determination that such condition was incurred in line of duty. It was recommended that he appear before a Physical Evaluation Board. The cliMcal abstract which accompanied the said diagnosis stated, in parts, as follows:
*432 * * * The general physical status is characterized by moderate increase in atrophy of the small muscles of the left hand. It is that opinion of the Chief of the Neurology Service that the patient has had symptoms that in_ retrospect were probably significant, in terms of his basic diagnosis, during his first weeks of service. It was not until early May 1955 that he was aware of any definite incapacity in terms of decreased dexterity of his left hand. The basic diagnosis implies a congenito-degenerative process. His spinal scoliosis is probably a signet of this, 'and it is to be noted he has had aching pain in his back for the past several years, for which he wore a back support; the patient had felt that this was due to long periods of standing and bending, incident to his work as a dentist. In spite of such, however, his induction physical examination does not record such or mention any neuromuscular or musculoskeletal defects. The patient had no awareness prior to service of the basic process as diagnosed. In view of the above, the many conflicting theories as to the etiology of syringo-myelia, its mode of onset, etc., and in spite of the patient’s short length of service, the diagnosis has been rendered as: Syringomyelia, “LOD: Yes.” He is partially and permanently incapacitated for military serv-ic6j and 'his socio-economic adjustment is severely impaired. The natural course of the basic process is to evidence some degree of progression. Whether such will be the case in this patient is unknown. * * *
A medical board, which reviewed the statements, findings, and diagnosis set out in the clinical abstract, in conjunction with the complete record, made a finding that plaintiff’s condition was incurred in line of duty.
9. On August 4, 1955, a duly constituted Physical Evaluation Board convened at Walter Beed Army Hospital. Plaintiff was represented by counsel, Col. Charles S. Hoult, whom plaintiff approved and authorized to inspect his records. Plaintiff first indicated his desire to be present at the convening of the Physical Evaluation Board, but subsequently indicated that he would not be present for the hearing of his case. He did not appear at the hearing. Plaintiff’s medical 201 file and the report of the proceedings of the medical board were admitted in evidence. The members of the Physical Evaluation Board had previously read and familiarized themselves with the evidence introduced and *433 the reading of the said records was dispensed with, at that time, without objection by plaintiff’s counsel. The Physical Evaluation Board found that plaintiff was permanently disabled by reason of syringomyelia of the cervicothoracic cord which existed prior to his term of service.
10. The president of the Physical Evaluation Board made a “Statement” for the record, in part as follows, with quotations from previous medical entries:
(a)* * *
“The patient noted shortly after going to Fort Sam Houston for his orientation course while swimming he had a crampy sensation the left hand.” xxx. “This subsided and he had no further trouble until approximately three weeks ago.” xxx. “On closer questioning he stated that he burned his right thumb while at Fort Sam Houston. This was done on a heat lamp and apparently he had no pain at that time. He did not notice the bum until after the blister had formed.” xxx. “He was seen at a medical out-patient by me on the 7 June.”
* * ❖ ❖ ❖
(a) * * * “The patient had no more difficulty until he started working again 30 May at A.P. Hill. At that time after workmg a short time his hands felt strange to him, he noted a loss of sensation (esp. for texture and fine movement).”
(b) * * * “The patient during his history taking declared his intention of getting his illness service connected and indicated he would give no history that would conflict with his intentions. It therefore appears the history is not accurate and from the physical findings the history appears more obviously distorted.” * * *
(c) * * * “This 27 year old patient apparently began to have difficulty with both arms, more marked on the left, in March of 1955. xxx” * * *
c. Textbook of Medicine, Eighth Edition, Report Sept. 1951, Cecil & Loeb, page 1455 states in part:
“Recent studies suggest that syringomyelia is a developmental defect which has its beginning in the subependymal zone where embryonal rests undergo proliferation and subsequent necrosis with cavity formation.” “The earliest recognizable signs of the disease usually occur in the second decade of life.” “The patient’s attention is first drawn to the loss of heat and pain sensation when bums and other injuries are noted in the absence of recalled exposure to traumas.”
*434 d. Therefore, it is the unanimous opinion of the board that this condition unquestionably existed prior to his entry into service, 31 March 1955, and was not aggravated by service.
11. Plaintiff testified that he was not given a copy of the “Statement” referred to in the preceding finding when the Physical Evaluation Board advised him of its findings, nor at any subsequent time during administrative proceedings in connection with his case, and had no opportunity to answer or comment on the statements contained therein. At the trial, he testified with respect to these statements as follows: At Fort Sam Houston he and fellow officers had a private outdoor swimming pool, where he swam daily for six weeks during his orientation course. On only one occasion during this period, during a morning in April when the weather was nippy, he had a cramp in his hand which came suddenly and lasted until he became accustomed to the water. It never recurred at any other time while swimming there.
His bum at Fort Sam Houston became infected and for this reason he went to the dispensary, but it was not without conscious pain, and the statement in the medical record “apparently without pain” is the conclusion of the writer.
The phrase “on closer questioning” does not imply a cross-examination, for the prolonged questioning was an endeavor to discover the reason for the “terrifying experience” plaintiff stated he had in the swimming pool. The statement by E. T. Cook that plaintiff indicated he would give no history that would conflict with his intention to obtain service-connection must be evaluated in conjunction with the fact that plaintiff described various incidents which might have a bearing on his condition, going back to his birth, when a forceps delivery occasioned an injury to his eye which was closed for a, period of 48 hours.
Plaintiff insisted that cancellation of his large disability insurance policy at the time of his entry into military service demonstrated that he was not conscious of any symptoms or difficulties prior to that time. In his “Statement,” the president of the Board omitted the last sentence of Mr. Cook’s entry which read: “However as far as the symptoms *435 given are concerned they seem consistent and reliable.” The statement that plaintiff began to have difficulty in “March 1955” was made by the president of the Physical Evaluation Board although there is no reference whatever in the medical records to any difficulties prior to plaintiff’s entry into active duty on March 31,1955.
12. On August 8, 1955, plaintiff submitted a rebuttal statement to the findings of the Physical Evaluation Board which contained citations of many medical authorities that the etiology of syringomyelia is unknown; that there are many conflicting theories as to its causes and that the finding that the condition existed prior to his entry into active duty was speculative.
13. On August 29,1955, the Adjutant General returned the proceedings to the Physical Evaluation Board for reconsideration, stating that the line-of-duty determination by the Medical Board was not clear, since the clinical abstract attached to the Medical Board proceedings contained the statement that plaintiff was inducted on October 20,1954, whereas, in fact, he entered service on March 31,1955. On August 31, the Physical Evaluation Board requested the Medical Board to give further consideration to the matter.
14. On September 14, 1955, the president of the Medical Board responded to the request for reconsideration as follows:
a. The statement of the Medical Board that the patient was inducted into the Army Dental Corps 20 October 1954 is in error. However, the staff was well aware that such date represented the time of his active duty medical evaluation while he was with the National Guard, and that his actual active duty dated from only 31 March 1955.
b. In view of there no longer being regulations defining set periods of active duty as to whether or not a disease entity will be considered LOD Yes or No, it has been our policy to record such in terms of best currently acceptable medical opinion. In this individual’s case although many would feel his basic degenerative process had its onset long before service, and perhaps justly so, the actual etiology and mode of onset of syringo-myelia are unknown. In view of this, the conflicting-theories as to time intervals of progression, the vagaries from case to case, and the patient’s prior recorded nor *436 mal findings, indicated to us that absolute categoric statements could not be made, that more than reasonable doubt existed in favor of the patient, and the LOD Yes determination rendered.
15. The Physical Evaluation Board reconvened on September 28, 1955. Military counsel for plaintiff 'asked the Board, in reconsidering the case, to review carefully the medical authorities quoted in plaintiff’s rebuttal. However, the Board gave only fifteen minutes to the hearing, convening at 9:45 a.m. and adjourning at 10:00 a.m., in spite of the fact that the president of the Board had been replaced by a new member who had not had the advantage of hearing the previous proceedings. After its brief consideration of the case, the Physical Evaluation Board reiterated its previous findings, to which plaintiff filed a rebuttal on September 28,1955, referring particularly to the September 14, 1955, statement of the president of the Medical Board.
The reconvened Physical Evaluation Board unanimously found that plaintiff was unfit for active duty, diagnosed as syringomyelia of cervicothoracic cord; that such unfitness was not the result of intentional misconduct or willful neglect and was not incurred during a period of unauthorized absence; that such unfitness was permanent; that such unfitness was not the proximate result of plaintiff’s performance of active duty; and that the unfitness existed prior to service. The Board recommended separation from the service because of physical disability which existed prior to service. The statement of the president of the Board, which was made a part of the proceedings, was as follows:
It is believed that somid medical principles lead to the conclusion that this patient’s condition existed prior to entry into military service and was not aggravated by such service.
16. On October 5,1955, the Army Physical Review Council, in reviewing the proceedings of the Physical Evaluation Board, requested the Surgeon General to make a line-of-duty determination in plaintiff’s case. The Surgeon General replied to the Army Physical Review Council as follows:
*437 1. The Surgeon General agrees that the diagnosis of syringomyelia is the most likely, diagnosis in the case of Captain Sheppard M. Siegel, Dental Corps, 02264474.
2. The cause of syringomyelia is unknown. Sy-ringomyelia is usually considered to have a slow and insidious onset. The Surgeon General considers it unlikely that the disease could have had its onset and reached the present stage, or that it was aggravated as a result of military service, during the brief period of active duty. It is the medical judgment of The Surgeon General that the condition should be considered as having existed prior to entry on active service.
3. Captain Siegel has indicated to the neurologist at the Walter Eeed Army Hospital that he carried “professional disability insurance” until he entered the Army, at which time he sold his dental practice and dropped the “professional disability insurance.” The action of Captain Siegel in dropping this “disability insurance” suggests to The Surgeon General that this officer had no knowledge that the present disease process was known at the time of entry on active duty. Examining authorities did not discover signs or symptoms suggestive of the disease on 20 October 1954,. when he had a physical examination incident to applying for a commission. The disease process was not discovered during the first six weeks of his military duty while a student at the Medical Field Service School, Fort Sam Houston, Texas, although in retrospect certain symptoms were manifested-at that time which are probably related to the disease process. In order to give the case of Captain Siegel every consideration, The Surgeon General recommends that his case be referred to The Judge Advocate General for an opinion of line of duty inasmuch 'as considerations specified in AE 600-140 to refute a presumption of line of duty may supersede the medical judgment of The Surgeon General.
17. AE 600-140 dated February 12,1953, provides, in part, as follows:
c. [paragraph 1] Presumptions. — Injury, disease, or death incurred by a member of the Army while on active duty, active duty for training, or during inactive-duty training, or by a cadet at the United States Military Academy, or by a member of the advanced course EOTC attending a summer camp will be presumed to have been incurred in line of duty and not because of the member’s own misconduct.
*438 d. Evidence required to rebut presumptions.
(1) Line of duty. — The presumption favoring line of duty may be overcome only by substantial evidence that the injury, disease, or death, or condition causing injury, disease, or death—
(a) Was proximately caused by the intentional misconduct or willful neglect of the individual (par. 2a).
(b) Occurred during a period of unauthorized absence (par. 26).
(c) Was contracted or incurred while neither on active duty nor engaged in authorized training in an active- or inactive-duty status and was not aggravated by the service (par. 2c).
« * $ $ *
e. Nature of evidence to be considered in Kne-of-duty and misconduct determinations. — In general, any evidence may be considered in making line-of-duty and misconduct determinations, with the exception that any written signed statement of a person in the Armed Forces, against his interest, relating to the origin, incur-rence, or aggravation of any injury or disease suffered by him, may not be considered in making determinations as to such injury or disease, unless he has first been advised that he need not make such a statement and also has been advised of his rights under the Uniform Code of Military Justice, Article 31(b).
ífc % íj: # íjí
c. [paragraph 2] * * * Irrespective of length of service, a member of the Army will be presumed to have been in sound physical and mental condition upon entering active service or authorized training in an active- or inactive-duty status. In order to overcome this presumption, it must be shown by substantial evidence that the injury, disease, or death, or condition causing injury, disease, or death was sustained or contracted while the individual was neither on active duty nor engaged in authorized training in an active- or inactive-duty status. Further, even if the foregoing presumption is overcome by such evidence, it is presumed that any additional disability or death resulting from the preexisting injury, disease, or condition was caused by service aggravation thereof. Only specific findings of “natural progress” of the preexisting injury, disease, or condition, based upon well established medical principles, as distinguished *439 from medical judgment alone, are sufficient to overcome the presumption of service aggravation. * *
(1) Presu~imption of sou~'nd condition.-Medical judgment aJone, as distinguished from well established medical principles, will not be considered the "substantial evidence" required to rebut the presumption of a member of the Army's sound condition at the time of his entrance into active military service. However, manifestation of lesions or symptoms of chronic disease, so close to the date of the patient's entry into active service that could not have originated after such entry, constitute "substantial evidence" that the disease existed prior to the entry. Likewise, manifestation of disease within less than the required minimum incubation period after the patient's entry into active service will be "substantial evidence" of inception prior to the service.
(2) Seriiice a~'gravatec1 condition.-Any increase in disability during active service resulting from a condition that existed prior to the active service will be presumed to have been service-aggravated, unless it can be proved otherwise on the basis of well established medical principles. Medical or surgical treatment furnished during service for preexisting conditions does not of itself establish service aggravation. Mere recurrences of certain diseases within a short period after the patient's entrance into active service such as epileptic seizures, seasonal asthma2 recurrent dislocations, etc., do not establish service aggravation. Also, incapacitating defects due to certain diseases, such as neoplasms, most endocrine disturbances, epilepsy, arteriosclerosis, and arthritis, and other chronic and degenerative diseases in which the onset is insidious and progress is slow, are of themselves not evidence of increased disability. Unless there was some pertinent local injury, or an abrupt and sudden pathological development during active service, such incapacitating defects may arise as a natural consequence of preexisting conditions, and not be incident to or aggravated by service. Acute infections such as pneumonia, active rheumatic fever (even though recurrent), acute pleurisy, acute ear disease, and sudden developments, as hemoptysis, lung collapse, perforating ulcer, decompensating heart disease, *440 coronary occlusion, or thrombosis or cerebral hemorrhage, occurring while in service will be regarded as service-incurred or service-aggravated, unless it can be clearly and unmistakably shown that there was no increase in severity during active service.
18. On October 18, 1955, in accordance with the suggestion of the Surgeon General’s office, the Army Physical Review Council requested an opinion of the Judge Advocate General on line of duty. On October 31, 1955, the Judge Advocate General rendered his opinion as follows:
1. Reference is made to your memorandum for The Judge Advocate General, subject as above, dated 13 October 1955, in which you request an opinion whether the disease of Captain Sheppard M. Siegel should be regarded as having been incurred in, line of duty.
2. In cases of this type the presumption favoring line of duty can be overcome only by substantial evidence that the disease existed prior to the individual’s entry into the service and was not service aggravated (sub-par. ld(l)c, AR 600-140, 12 Feb 1953). In addition, in order to provide the substantial evidence necessary to overcome the presumption that the disease was aggravated by the member’s service (subpar. 2c(2), AR 600-140, supra), specific findings must be made, “based upon well established medical principles, as distinguished from medical judgment alone,” that the preexisting disease naturally progressed during the member’s service (subpar. 2c, AR 600-140, supra).
3. In Disposition Form Comment No. 2 (MEDDP 201 Siegel, Sheppard M. (0)), subject: “Review of Physical Evaluation Board Proceedings”, dated 10 October 1955, The Surgeon General states that the cause of syringomyelia is unknown but that it is unlikely that the disease could have had its onset and reached its present stage, or that it was aggravated, as a result of military service. The mentioned comment does not of necessity establish that the conditions responsible for Captain Siegel’s disease existed prior to his entry into the service. Furthermore, from the statements made it appears that there are no well established medical principles with regard to the disease of syringomyelia and that the views propounded by The Surgeon General constitute an expression of his medical judgment rather than an opinion based on established principles. In *441 view of the foregoing, it is the opinion of this office that there is not sufficient evidence in the file to establish that the disease existed prior to the member’s entry into the service nor is there sufficient evidence to overcome the presumption of service aggravation.
19. The members of the Physical Review Council, being in disagreement as to the line-of-duty finding, referred the case to the Army Physical Disability Appeal Board on November 9, 1955. While the Physical Review Council submitted to the Board the conflicting views of the Surgeon General’s representative, the G-l (Assistant Chief of Staff) representative and the Judge Advocate General’s representative on the Council, it did not send to the Board the statement of the Surgeon General that his opinion was based upon medical judgment alone and might be superseded by AR 600-140, or the opinion of the Judge Advocate General that the medical opinion and other evidence were not sufficient to rebut the presumption established by the regulation.
20. On November 15, 1955, the Army Physical Disability Appeal Board concurred in the findings of the Physical Evaluation Board and recommended that plaintiff be separated from the service because of physical disability EPTS (existed prior to service), and on November 23, 1955, plaintiff was released from active duty by reason of physical disability.
21. AR 15-160, dated August 20,1953, relating to the procedures of the Army Physical Review Council and Army Physical Disability Appeal Board, provided as follows:
6. Basis for determinations. — The members of the Council will be guided by the law, and applicable regulations, principles, rules, and precedents established by Department of the Army, including medical standards as to fitness or unfitness stated by The Surgeon General, and legal opinions rendered and legal principles established by the Judge Advocate General. * * *
12. Basis for determinations. — The members of the Appeal Board will be guided by the law, and applicable regulations, principles, rules, and precedents established by the Department of the Army, including medical standards as to fitness or unfitness stated by The Surgeon General, and legal opinions rendered and legal principles established by The Judge Advocate General.
*442 AB, 635-40B, dated June 28, 1955, entitled “Personnel Separations — Physical Evaluation for Betention, Separation, Or Betirement,” paragraph 25-a(5), provided:
* * * In determining whether the disability of a member was incurred prior to entrance into service, and, if so, whether it was aggravated thereby, the principles set out in AB 600-140 will be followed.[2]
22. On December 15, 1955, the Veterans Administration, based upon the “Statement” of the president of the Physical Evaluation Board (Finding 10), found that the plaintiff’s condition existed prior to induction and was not aggravated over and above natural progress. The Veterans Administration finding was expressly based upon “sound medical judgment.”
23. On November 15, 1955, the Army Physical Disability Appeal Board considered plaintiff’s case. This Board did not have before it the opinion of the Surgeon General stating that his opinion was based upon medical judgment alone and might be superseded by AB 600-140 or the opinion of the Judge Advocate General to the effect that the medical opinion and other evidence were not sufficient to rebut the presumption established by the regulation. All members of the Board concurred in the findings of the Physical Evaluation Board and recommended that plaintiff be separated from the service because of physical disability which existed prior to service. The recommendation and findings of the Army Physical Disability Appeal Board were approved by the Secretary of the Army on November 18, 1955.
24. It is impossible to tell with certainty whether cavities existed in plaintiff’s spinal cord without a post-mortem examination of the spine. Therefore, the diagnosis of syringo-myelia in plaintiff’s case is uncertain. The Acting Chief of Neurosurgery at Walter Beed Army Hospital, in a consultation report dated July 1,1955, stated:
* * * There is no definite coordination difficulty. I feel that a cerebral syringo is a good probability and that the tumor cannot be ruled out, especially in view of the rapid progression.
*443 At the same hospital, the Chief of Dermatology described the condition as “probable” syringomyelia; a surgeon referred to it as “suspected” syringomyelia; the Chief of Neurology, Dr. Hammill, testified that the diagnosis was not certain; and the Chief of the Professional Division, Surgeon General’s Office, referred to it as the “most likely diagnosis.”
25. The etiology or cause of syringomyelia is unknown and there are many conflicting theories as to its cause or causes. It is stated uniformly by medical text writers that the cause is unknown; that there may be various causes, and that there are many conflicting theories as to the causes.[3] The Government medical expert, Dr. Webb E. Haymaker, of the Army Institute of Pathology, conceded that the cause is unknown and that there are various theories as to cause. It is so stated by the Office of the Surgeon General with reference to plaintiff’s case.
26. Syringomyelia is a chronic, slowly progressive condition when congenital in origin. It may develop very rapidly when caused by other conditions, such as trauma, vascular disturbance, infection, etc. The defendant’s expert medical witness stated that, in congenital cases, the symptoms might become manifest within a few days after birth.
The regulation creating the presumption of service in-currence under certain circumstances is predicated upon the fact that medical science has not yet been able to determine the etiology of many diseases or conditions; that military service is often unusually strenuous and rigorous and that, when there have been no known symptoms prior to active service, members of the military establishment are given the benefit of the doubt “irrespective of the length of service.” There is no evidence in this case of specific trauma or un *444 usual circumstances to which the inception of plaintiff’s condition can be specifically attributed. A decision or finding favorable to plaintiff can only be made upon the basis used by the Judge Advocate General’s legal application of the provisions of the applicable regulation, i.e., AR 600-140.
27. Since there are so many possible causes of syringo-myelia and the actual cause of the disease is unknown, it is impossible to state the time interval between onset or inception and manifestation of symptoms. One cannot tell with any certainty when the onset occurs, but it can be abrupt and sudden in its inception.
28. In view of the uncertainty of the etiology of syringo-myelia, the many conflicting theories, the complete lack of definite knowledge with respect to the time intervals between onset and symptoms, it is impossible to state on any well established medical principles, as required by Army regulations, that plaintiff’s condition preexisted his entry into the service. If plaintiff’s condition originated prior to active military service, it is likewise impossible to state on well established medical principles, as required by Army regulations, that it was not aggravated as a result of military service. The conclusion of the Physical Evaluation Board that the condition preexisted plaintiff’s military service appears to be based entirely on medical judgment. The defendant’s medical witness, who subscribed to the congenital theory, admitted that he reached this conclusion on the basis of medical judgment. The conclusion of the Medical Board that plaintiff incurred the disease in line of duty was based upon the fact that there were no sound medical principles upon which it could be found that plaintiff’s disease originated prior to his entry into the service and that such a finding would be purely theoretical.
29. In finding that the plaintiff’s condition existed prior to his entry into the military service, the Physical Review Council and the Army Physical Disability Appeal Board did not follow the legal opinion of the Judge Advocate General that such a finding could not be made upon the evidence under Army Regulations 600-140, February 12,1953.
30. Although the plaintiff had scoliosis, a curvature of the spine, at the time of his entry into active duty, and this *445 condition may sometimes be associated with syringomyelia, it is a common condition which a great many people have who are not suffering from syringomyelia. The military doctors attributed plaintiff’s difficulty with his back to his dental work, standing and bending at the dentist’s chair. The defendant’s medical expert apparently did not consider plaintiff’s scoliosis as a significant symptom, as he did not testify concerning this condition. While the plaintiff had used a back brace when engaged in private practice, he discarded it when he entered military service and never found it necessary to use it again, even after having been afflicted with the condition diagnosed as syringomyelia.
31. Under the Veterans Administration Schedule for Eating Disabilities, plaintiff’s conditions could be rated as 80 percent disabling, in a combined rating based upon the findings of the Medical Board and Physical Evaluation Board. In applying the applicable schedule, the Judge Advocate General reached the same rating evaluation, i.e., a combined rating of 80 percent.
CONCLUSION OE LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and judgment will be entered to that effect.
The amount of recovery will be determined pursuant to Eule 38 (c) of the Eules of this court.
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on May 20, 1960, that judgment for the plaintiff be entered for $13,446.92.

 See Finding 17 for excerpts from AR 600-140.

 See Finding 17 for excerpts from AB 600-140.

 In MacCallum, A Textbook of Pathology, 7th Edition, p. 1025, syringomyelia is listed under “Conditions of Unknown Etiology Affecting Central Nervous System or Muscles,” and it is stated: “Syringomyelia is a condition variable in form and position of which the cause is not known and in which even the historical nature is in dispute.” In Hicks and Warren, Introduction to neuropathology, 1950, p. 268, it is stated: “The causes of syringo-myelia are unknown.” The same statement appears in other texts. In Ein-layson, Clinical Neurology, 1955, p. 1865, it is stated: “Those who have studied the problem with greatest interest and who have observed the greater number of cases seem to believe that there is no single cause for syringomyelia, but rather a number of varieties of the disease and a number of causes.”