Jones, Chief Judge,
concurring in part,
in which Lara-more, Judge, joins:
I concur in the court’s holding that plaintiff is entitled to recover, but on the basis of the position I took in Frederick v. United States, 150 Ct. Cl. 769, I would limit recovery to the period six years prior to the filing of the petition in this court. 28 U.S.C. 2501.
OPINION OP THE COMMISSIONER
Plaintiff, a former Army officer, was released from the service in 1941 because of permanent physical disability, but without disability retired pay because of the determination that the incapacity was not incurred as an incident of the service. He here sues for such pay. Since plaintiff’s attempts to obtain retired pay now extend for almost 17 years, the record is a long one. However, the following are the essential facts, in brief:
Plaintiff first enlisted in the New York National Guard in 1939. In 1940, he was inducted into active Federal service and promoted to corporal, such service terminating in 1941. In 1942, he was recalled to active duty and assigned to the Air Corps. After successfully completing a bombardier course, he was, in January 1943, commissioned as a second lieutenant in the Army of the United States, and successfully performed his duties in that capacity until July 22, 1943. Up to that time (with the exception of the usual childhood diseases and a tonsillectomy and appendectomy while in the service), plaintiff appeared to be a well-adjusted and healthy individual. In connection with his above-described military service, he had received at least seven physical examinations, all showing no mental or physical defects (except for flat feet, which was not considered as constituting a disability). Similarly, his efficiency ratings were all satisfactory or excellent.
However, on July 22, 1943, a seemingly minor incident occurred at Ephrata, Washington, which ultimately served to *219 change radically the entire course of plaintiff’s life. During the landing of the aircraft in which plaintiff was a crew member on a routine mission, plaintiff in some way suffered a blow to his head. The plane was not damaged and no one else in it was injured. Plaintiff’s injury did not appear to be serious. No unconsciousness resulted. There was a small (4-inch bleeding laceration on the right side of plaintiff’s head, for which he received treatment at the Base Hospital. He was in the hospital for 2 days and then released for return to duty.
However, approximately 2 months later, while plaintiff was stationed at Kearney, Nebraska, he became ill. He entered the Base Hospital there and from that time on until his discharge from the hospital in February 1944, just prior to his release from active duty, plaintiff was continuously hospitalized. He entered the hospital at Kearney on September 19, 1943, with a fever and a condition which was tentatively diagnosed as influenza or pneumonia. However, while in the hospital plaintiff complained, among other things, of pains in his head and double vision. He gave the doctors an account of his having been struck on the head during the airplane “accident” of July 22, and of his having experienced headaches, nausea, and double and blurred vision ever since. Accordingly, the doctors made various examinations to ascertain whether plaintiff had suffered a skull fracture, but all examinations were negative. However, a neurological examination showed that plaintiff was confused and disoriented, that his memory was impaired and his emotional reaction poor. Plaintiff failed to improve and it was decided to transfer him from the Base Hospital to an Army general hospital. Consequently, plaintiff was, on September 23, transferred to the Fitzsimons General Hospital at Denver, Colorado, for “observation for subdural hematoma” (brain tumor) as well as for an acute catarrhal condition, and remained at this hospital for over 4(4 months. While there, plaintiff again complained of constant throbbing headaches ever since his airplane accident. He also complained of dizziness, weakness, and double vision. As a. result, the doctors gave plaintiff numerous tests and examinations to ascertain whether plaintiff was suffering from brain damage *220 or tumor, but all tests were construed to be negative. During this period, plaintiff had two seizures. Tests for epilepsy were then given, which again were construed to be negative.
Finally, in November 1943, plaintiff was given a neuro-psychiatric examination, the result of which was that plaintiff’s condition was diagnosed as “Psychoneurosis, hysteria, severe,” the psychiatrist also reporting, after a long interview with plaintiff which delved back into his early life, that the first symptoms of plaintiff’s illness occurred the day after plaintiff struck his head. He made no determination as to whether the illness was incurred in line of duty. Instead, he requested that complete information about plaintiff’s life, both in and out of the service, be obtained. Such a survey was then undertaken.
After reports were received from plaintiff’s various commanding officers in the service (none of which contained any adverse information about plaintiff) and a report of an interview with plaintiff’s mother, and after another lengthy consultation with a second psychiatrist, the Chief of the Hospital’s Neuropsychiatric Service, plaintiff’s condition was confirmed as “Psychoneurosis, hysteria, severe.” During the consultation with the psychiatrist, which again delved deeply into plaintiff’s life, plaintiff told of how, while he was at Bombardier School, he had “experienced considerable conflict, anxiety, and had numerous qualms over the prospect of having to bomb women and children.” The psychiatrist felt this to be of considerable significance, and on the question of whether plaintiff’s psychoneurosis was incurred in line of duty, determined that it was not “because there were manifestations of emotional instability with anxiety, tension and indecision prior to entering on active duty, while patient was attending bombardier’s school as an air cadet.” He recommended plaintiff’s appearance before a Ketiring Board. At that time, Army regulations provided that non-Begular Army officers were not entitled to be retired for a physical disability which had originated during the time the officer had served as an enlisted man. Capps v. United States, 133 Ct. Cl. 811.
Plaintiff then appeared before a Disposition Board of three doctors who likewise confirmed the psychoneurosis *221 diagnosis and, after referring to the plaintiff’s feelings of anxiety during enlisted service about bombing women and children, similarly found that the disability was not incurred in line of duty because it “existed prior to active duty as an officer.” In February 1944, plaintiff appeared at the hospital before an Army Retiring Board of five members, two of whom were medical officers. Two psychiatrists testified, one of whom was the Chief of the Neuropsychiatric Service to whom plaintiff first related his anxiety about bombing women and children. They both testified that the cause of plaintiff’s incapacity, which was permanent, was “psychoneurosis, hysteria, severe,” that the date of its origin was undetermined hut that the symptoms were first manifested while plaintiff was an air cadet at the Bombardier School, and therefore existed prior to plaintiff’s service as an officer. They further testified that the airplane accident did not cause his condition, the factors for which were already present, but was only the incident which led to plaintiff’s “train of symptoms.” The Board adopted the testimony of the psychiatrists, and found plaintiff to be permanently incapacitated because of “psychoneurosis, hysteria, severe” but that neither the incapacity nor the cause of it were the result of an incident of the service, the incapacity having originated at some unknown time prior to plaintiff’s commissioned service, and that it first manifested itself in the service as an officer on or about July 22, 1943, the date of plaintiff’s accident. Upon the approval of the findings by the Secretary of War, plaintiff was honorably discharged from his commission because of physical disqualification, and was advised that he was not entitled to retirement pay benefits because his incapacity was not incurred in line of duty while on active duty as an officer.
Thereafter plaintiff applied for and received compensation from the Veterans’ Administration, the amounts differing during various periods. Plaintiff found it exceedingly difficult to adjust to civilian life, holding a variety of jobs for short periods of time, and, complaining of headaches, other pains, irritability, dizziness, nausea, vomiting, nervousness, ringing in his ears, inability to sleep, and attacks of blindness, constantly received treatment from Veterans’ Administration *222 facilities and private doctors. The VA doctors, after various examinations, at first agreed with the Army diagnosis. However, in 1945, on the basis of a private psychiatrist’s conclusion that “there was nothing to support the claim that the disability was non-service connected” and that plaintiff’s condition in fact was caused by “his accident even though minor”, plaintiff requested a review of his case by a Disability Eeview Board. Such review was granted but the Eetiring Board’s previous findings were approved.
On December 29, 1950, the Secretary of the Air Force reversed the previous ruling that a non-Eegular Air Force officer was not entitled to be retired with disability retired pay if the incapacitating injury or disease was incurred while in enlisted status. The ruling was substantially identical to the Secretary of the Army’s ruling set forth in the court’s opinion in the Capps case.
In 1951, plaintiff’s case was, as a result of the new ruling, administratively referred to the Air Force Disability Review Board. Plaintiff was not so advised, no hearing was held, and the Board took no action on the matter.
In February 1955, plaintiff applied to the Air Force Disability Eeview Board for a review of his case, supporting his application with a statement from a private doctor that plaintiff was suffering from brain damage. However, plaintiff’s application for a rehearing was denied with the advice that his only avenue was to seek relief from the Air Force Board for the Correction of Eecords.
In May and June 1955, plaintiff was again hospitalized for a period of approximately 2 months in a VA hospital. Additional tests and examinations were given, which, after a further review of plaintiff’s record, convinced the VA doctors that plaintiff’s condition was due to organic brain damage “with neurotic reaction.” As a result, the VA certified that its previous diagnosis of psychoneurosis “was clearly and unmistakably an error and that the present diagnosis represents his true condition.”
In July 1955, plaintiff applied to the Correction Board, relying on the VA change in diagnosis. Before taking the case, the Board sought the Surgeon General’s advice. However, the Surgeon General advised that in his opinion the *223 Disability Eeview Board should first review the case in light of the new 1950 ruling by the Secretary concerning the retirement of officers who incurred disability while serving in enlisted service. Accordingly, the Correction Board returned the case to the Disability Eeview Board which this time consented to reconsider it. However, after a hearing in 1956, the Eeview Board confirmed the psychoneurosis diagnosis and again denied plaintiff’s application. In doing so, it made findings which were the same as the original Eetiring Board’s except that it changed the finding that plaintiff’s incapacity originated at some unknown time prior to service as an officer to a finding that “the date of the origin of the incapacitating defect was prior to entry into military service.” It also made an additional finding that there was no aggravation by reason of such service. Thereupon the Correction Board, without a hearing, also denied plaintiff’s application to it.
However, in 1957, plaintiff again applied to the Correction Board, contending that the change by the Disability Eeview Board in the finding with respect to the date of origin of the incapacity violated this court’s decision in the Oapps case. The Board then decided to grant plaintiff a rehearing and reconsideration. It did so, 'but in 1958, considering the Capps case inapplicable, refused to correct plaintiff’s record. The petition herein was filed shortly thereafter.
Plaintiff again relies here on the Capps case. Defendant replies that the Correction Board’s conclusion that Capps was not applicable to the instant situation was supported by substantial evidence. On this issue there would appear to be little doubt but that plaintiff is correct. The question involved is the proper interpretation to be given the Eetiring Board’s findings, and not one of “substantial evidence” pertaining to a factual question. Capps v. United States, supra.
Capps held that when an officer was denied disability retired pay 'because his incapacitating defect originated during enlisted service, and the case is then reviewed after the Secretary’s reversal of this policy, the Review Board cannot then for the first time, without any new evidence whatsoever, make a new finding that the defect arose even before entry into enlisted service. This shifting back of the time of the *224 incurrence of the incapacity would serve to subvert the effect of the Secretary’s new ruling. There can 'be little doubt that this is what was done in plaintiff’s case.
The Correction Board denied the applicability of Oafps to the instant situation because, it said, the findings of the original Retiring and the 1956 Review Boards are not inconsistent. This can only mean that the findings of the Retiring Board are consistent with the Review Board’s theory and finding that plaintiff’s illness originated and manifested itself before “entry into military service.” However, the record clearly rebuts this contention. While it is true, as defendant says, that the Retiring Board did not specifically state in its findings that plaintiff incurred his disability while he was an enlisted man, nevertheless the finding that it originated prior to the time of his entry upon commissioned service and that it first “manifested itself” during “service as an officer” when he suffered his head injury can, in light of the record of the Board proceedings and the events leading up to it, only be properly interpreted as meaning that it was in fact incurred and first manifested itself while plaintiff was an enlisted man. Under the then policy, such a finding was sufficient to bar the receipt of disability retired pay.
As shown, plaintiff’s condition was first diagnosed as psychoneurosis by a psychiatrist on November 2, 1943, after all tests for brain injury were construed to be negative. That psychiatrist made no determination as to line of duty, but, based on the information he then had, concluded that plaintiff’s symptoms first became manifest at the time of his airplane accident. However, he requested that further information about plaintiff be obtained. After the investigation was completed, a second lengthy psychiatric consultation was had on January 3, 1944, with another psychiatrist (Dr. Barbato), during which were brought out for the first time plaintiff’s anxieties and fears while in the enlisted service about bombing women and children. This was considered of major importance and the first manifestation of plaintiff’s illness. It was officially given by the psychiatrist as the sole reason why plaintiff’s illness was not incurred in line of duty, although various other matters and incidents in plaintiff’s life before entering the military service were explored. *225 (Finding 13.) Next, when plaintiff appeared before the Disposition Board of three medical officers, it was again found that his condition was not incurred in line of duty because it existed “prior to active duty as an officer”, again the conflict and anxiety over bombing women and children being the only symptom mentioned. (Finding 14.) The psychiatrist who first discovered this symptom was the chief of the two medical witnesses who testified before the Retiring Board. His aforesaid official report stating that plaintiff’s illness was not incurred in line of duty “because there were manifestations of emotional instability with anxiety, tension and indecision prior to entering on active duty, while patient was attending 'bombardier’s school as an air cadet” was read in full to the Board. Both medical witnesses repeated this “first manifestation” incident in their testimony. They relied on no preservice symptoms. Thus, the record of plaintiff’s case when it came before the Board showed that there was complete unanimity that plaintiff’s illness was not incurred during “service as an officer” because it first manifested itself during enlisted service, no premilitary symptoms being relied on at all.
In view of this history, the Retiring Board’s finding that plaintiff’s incapacity had its first manifestation prior to his military service “as an officer” could rationally have only one meaning. It was necessarily based on the only testimony of the medical witnesses that related to that question, i.e., the first manifestations of emotional instability occurred while plaintiff was an air cadet. This was obviously the construction the service itself placed upon the Retiring Board’s finding for, after the Secretary’s new ruling in 1950, plaintiff’s case was, as a matter of routine, and without plaintiff’s knowledge, referred to the Disability Review Board for review in light of the new ruling. Although for some reason not shown by the record the Board then took no action, when plaintiff in 1955 applied to the Correction Board, the Surgeon General again thought at that time that the case should first be considered by the Review Board “in view of the new interpretation”, and as a result, plaintiff was then given a hearing by the Review Board. Indeed, unless the Review Board itself so construed the Retiring Board’s findings, it is *226 not understood why it would have felt the need to make any changes or additions to the findings. It could have left the findings as they were. The very fact that the Review Board found that the incapacity occurred “prior to entry into military service” — a finding which the Retiring Board did not make — indicates that the Review Board itself construed the Retiring Board’s findings as not so stating. Certainly, a finding that a disease first manifested itself while serving as an enlisted man, which was what the Retiring Board’s finding amounted to, is wholly different from a finding that the disease manifested itself even before entering military service at all, especially when the Retiring Board’s refusal to find that the disease was incurred in line of duty plainly was based directly on the fact that it first manifested itself in the enlisted service. Had the Retiring Board in fact thought that plaintiff’s illness existed prior to his military service, it could have easily so found specifically.
Furthermore, there was no new medical evidence to support the Review Board’s finding that plaintiff’s psychoneu-rotic incapacity existed prior to entry into military service. No testimony of such a nature was introduced at the Review Board hearing. Indeed, the only new medical testimony offered at that hearing was that the cause of plaintiff’s incapacity was not psychoneurosis at all, but that it was, instead, organic brain damage suffered while plaintiff was an officer. The Review Board merely said that although the Retiring Board found that plaintiff’s illness “had originated prior to extended active duty [i.e., as an officer], * * the clinical history supports the opinion that the defect actually originated prior to military service.” (Finding 32(a).) And the Correction Board, in supporting the Review Board’s finding, also relied on “a careful study of all the physical examinations in and out of service” in order to arrive at its conclusion that “applicant has been a life-long neurotic.” Thus, these Boards only reviewed the same data that was before the Retiring Board, and based on a different “opinion” made an entirely different finding — a finding which was considered sufficient to take the case out of the Secretary’s new policy.
*227 The only preservice incidents to which the Correction Board referred were (1) plaintiff’s dislike for and reaction to eating fish since almost choking on a fishbone while a child, and (2) a fear that plaintiff had of falling. However, both of these matters were specifically considered by the psychiatrist who first diagnosed plaintiff’s condition as psychoneurosis on November 2, 1943 (finding 11(b)) but who, plainly, considered them to be of no importance, since he referred only to the symptoms after the blow to plaintiff’s head as being the “first symptoms manifest”. These same two factors were again considered by the second psychiatrist who confirmed the diagnosis of psychoneurosis on January 3, 1944, and who again placed no importance on them. (Finding 13.) As stated, the only “manifestation of emotional instability” he referred to was plaintiff’s fears about bombing women and children. This too was the only “symptom” referred to by the three doctors composing the Disposition Board (finding 14). And the two doctors who testified before the Betiring Board again made no mention of these other matters in plaintiff’s early life or placed any reliance on them. Under these circumstances, it was not proper for either the Beview Board or the Correction Board, without any supporting evidence whatsoever, to rely upon such factors to support the contention that plaintiff suffered from the illness before he ever entered the service.
The most obvious error committed by the Correction Board in its attempt to prove that plaintiff had been a “life-long neurotic” was its reliance on a diagnosis of plaintiff as an “excitable, talkative, emotionally unstable” and “dramatic and immature individual.” But this description of plaintiff’s behavior was given as a result of the aforesaid November 2, 1943 psychiatric examination. This was after plaintiff’s difficulties arose — three months after he was hospitalized. To take a description of plaintiff while he was suffering from his illness — an illness which involves, among other things, a change in personality itself- — and then, without any supporting evidence, to attribute such symptoms to his pre-service life, was certainly not proper. Indeed, all of the available evidence showed that before entering the service, plaintiff did not fit this description at all but was, instead, a *228 relatively stable, well-adjusted person wbo got along satisfactorily in his work and with people in general, and who enjoyed good mental and physical health.
For all of the above reasons, it seems clear that the Review Board’s change in the Retiring Board’s finding as to line of duty was improper, since the findings of a Retiring Board, approved by the Secretary, are “final * * * and can be reopened only upon a showing of fraud, substantial new evidence, mistake of law, or mathematical miscalculation.” Carlin v. United States, 121 Ct. Cl. 643, 659; Spencer v. United States, 121 Ct. Cl. 558, cert. den., 344 U.S. 828. “The findings of a Retiring Board, once approved by the Secretary of War, cannot be changed because of a mere revaluation of the existing evidence.” Campbell v. United States, 132 Ct. Cl. 122, 127. Therefore, under the Secretary’s changed policy determination, plaintiff should, on the review of his case by the Disability Review Board in 1956, have been retired with disability retired pay. Capps v. United States, supra.
Defendant contends, however, that, so far as line of duty is concerned, there is a distinction between when a disease first manifests itself and when it had its origin, and even though plaintiff’s disease be considered as having first manifested itself in his enlisted service, nevertheless, considering the very nature of psychoneurosis, it must necessarily have existed prior to entry into military service. Defendant points to the medical theory, supported by respected experts, that psychoneurosis is a disease that exists from early childhood, regardless of any manifestations of symptoms thereof during early life, and that it may, under an appropriate set of stresses and strains, break out and first manifest itself at any time of life. The first manifestation symptoms do not, according to this theory, indicate the origin of the disease, which was always present, and which may be made evident even by a relatively minor incident, such as the blow to his head which plaintiff experienced in the airplane incident in July 1943. Under this theory, even the doctrine of aggravation would be inapplicable to this particular disease, and defendant in fact now so contends. As pointed out, in addition to the change in the Retiring Board’s line of duty find *229 ing, the Review Board also made a new finding that there was no aggravation of plaintiff’s condition by reason of his military service.
This contention cannot be accepted. In the first place, as already shown, the distinction relied upon between first manifestation and origin did not appear to constitute defendant’s theory at the time plaintiff was retired. As noted, at that time the chief medical witness before the Retiring Board, who was the Chief of the Neuropsychiatric Section at the Fitzsimons General Hospital, concluded that plaintiff’s illness was not incurred in line of duty only because of his manifestations of emotional instability while he was an air cadet. (Finding 13.) The Disposition Board of three doctors also so concluded (finding 14). Secondly, if this was in fact the theory of the Retiring Board, which would indeed serve to make the Capps case inapplicable, or of the Review or Correction Boards, it would seem clearly to contravene the applicable Army Regulation (40-1025; finding 36) pertaining to the presumption that a disability is service-connected or aggravated. Prior to the time he hurt his head, plaintiff had had at least seven physical examinations in connection with his military service, all showing him to be mentally and physically fit. When, after a period of satisfactory military service, including excellent efficiency ratings and promotion from enlisted status to a commissioned officer, plaintiff thereafter suddenly became ill and continued to be so until ultimately declared to be of no further use to the service, with a finding of permanent incapacity, then, as the court said in the similar case of Frederick v. United States, 150 Ct. Cl. 769, 771, 772: “Having in mind the presumptions which the statutes and regulations apply to such a situation, the task of the Army and the Government in justifying” the conclusion “that the plaintiff’s illness and disability were not incurred, were not even aggravated, by his Army service * * * is a formidable one.”
If defendant’s medical theory is correct, there could never be any military retirement with disability retired pay when the mental illness of psychoneurosis is involved. But the same Army Regulation 40-1025 again rebuts this contention, for it specifically addresses itself to the subject of psychiatric *230 cases, and describes those which will be “considered to be in line of duty.” These include cases of “psychoneurosis occurring in individuals in whom predisposition * * *, but not the actual disease itself, existed prior to entry into the service.” The regulation even goes on to provide that “Neurotic traits in themselves will not 'be regarded as necessarily indicating the presence of psychoneurosis * * And it further proceeds to include even persons who had a psychiatric condition “prior to entry into the service, but where there is evidence to show that the disorder has been aggravated by the service.” Clearly, defendant’s medical theory is inconsistent with these Army regulations themselves. It is also inconsistent with the Joint Armed Forces Regulation promulgated in 1949 in the form of a booklet entitled “Nomenclature and Method of Recording Psychiatric Conditions” (finding 37) and which defines psychiatric disorders as resulting from the repression “of powerful emotional charges, usually attached to certain infantile and childhood developmental experiences.” (Italics supplied.) It is thus recognized that not all cases stem from childhood experiences. Similarly, a Surgeon General’s Manual prepared in 1945 specified the cases of psychoneurosis which could be considered as having been incurred or aggravated in line of duty. (Finding 38.) Indeed, the theory is inconsistent with the actual practice of the services in handling these cases, for defendant’s own expert witness testified that the important question in such cases is “at what point the symptoms appeared.” The regulations are not to be lightly taken. They must be strictly observed. They are “binding on the retiring boards, and on the Surgeon General, and on the Disability Review Board, and on the Board for Correction of Military Records and on the Secretary of War. Since they were reasonably designed to carry into effect acts of Congress, they have the force and effect of law.” Prichard v. United States, 133 Ct. Cl. 212, 216.
However, even if the incidents in plaintiff’s preservice life mentioned above (dislike of fish, fear of falling) be deemed to constitute psychoneurotic symptoms, as the Review and Correction Boards held, and to which defendant now adds additional alleged symptoms (such as the motivations behind *231 plaintiff’s leaving higbt school to go to work), plaintiff’s complete collapse in the service which led to his discharge must certainly be considered an aggravation of his condition under the Army regulation or by any definition of the term. Here too, defendant’s expert at the trial made plain that the actual practice in retirement cases differs from defendant’s theory, and that where it is shown that there were symptoms prior to service that were not sufficiently severe to interfere with the man’s functioning in a reasonably satisfactory manner in the various aspects of his life, but the severity of the subsequent symptoms in the service were so much greater as to result in total incapacity so far as the performance of his military duties are concerned, then the incapacity is deemed to be service-aggravated.
Further, separate and apart from the conflict between defendant’s theory and the regulations, as well as the actual practice, the theory is, as defendant’s expert psychiatric witness at the trial conceded, based, in the words of the regulation itself, on “medical judgment alone, as distinguished from well-established medical principles.” Therefore, it cannot “be considered sufficient to rebut the presumption of the patient’s sound condition at the time of his entrance into active military service.” (AN 40-1025, par. g(3).) Siegel v. United States, 148 Ct. Cl. 420. The field of mental illness, and especially its origin and causes, as well as its relationship to head injuries in individual cases, is, the witness conceded, a controversial one. To illustrate, plaintiff’s expert psychiatric witness at the trial disputed defendant’s theory, testifying that a psychoneurosis could originate, under appropriate stresses and strains, at any time in life, and that it is not true that the disease itself (as distinguished from a predisposition to it) existed prior to the first manifestation of the symptoms thereof. In Brown v. United States, 143 Ct. Cl. 605, the court, in reversing the findings of the Army Retiring Board and the Disability Review Board that the officer’s psychoneurosis existed prior to military service, made plain that the same principles relating to presumptions of service connection are applicable to a psychoneurosis case as in the case of other disabilities. *232 Here again, the language of the court in the Frederick case is particularly apt:
In view of the elusive and uncertain character of medical knowledge and theory about mental illness, it would seem that the presumption, required by Army Regulation 40-1025, that a disability which arises in military service is service-connected or at least service-aggravated would be particularly applicable and helpful in the case of mental illness. The whole purpose of the presumption, and of the accompanying provision that nothing short of “established medical principles, as distinguished from medical opinion” should be sufficient to rebut the presumption, was to prevent the injustice of the soldier’s oeing denied his rights because the doctors were engaged in an interesting medical dispute, [p. 772]
Defendant here also attacks plaintiff’s credibility, pointing out his exaggerations and even admissions of outright lying.[1] The attack is not understood. It can only mean to imply that plaintiff really was not and is not ill at all and is deceptively attempting to obtain compensation. All of the incidents relied on occurred after his discharge from the Army for an ilhiess which the Army formally found to constitute a permanent incapacity so severe that he was of no use to it, not even in a limited capacity. Abnormal behavior of one suffering from such a mental illness surely cannot be relied upon to prove that the person is not really ill at all. The fact is that not only the Army Retiring Board found in 1944 that plaintiff was permanently incapacitated, but that that finding was reaffirmed in 1956 by the Air Force Disability Review Board and as recently as 1958 by the Air Force Correction Board. That plaintiff’s illness is mental rather than physical makes it nonetheless real. These considerations preclude any attempt by defendant to question in this proceeding the basic fact of plaintiff’s incapacity. Similarly, defendant’s contention that, if plaintiff has a neurosis, it was brought about by an alleged desire to escape overseas service, is irrelevant. Even if this unsupported *233 contention is accepted, the psychological cause of the illness nevertheless does not minimize the basic fact of the existence of the illness.
The above conclusions are all based upon the acceptance of the Army Retiring Board’s original 1944 diagnosis of plaintiff’s case as psychoneurosis, and the reaffirmation thereof by the Disability Review Board in 1956 and the Correction Board in 1958. Plaintiff contends that that is not the true diagnosis of his condition, and that it is really organic brain damage suffered from the blow to his head during the aircraft landing. In support, he relies on the revised formal findings of the YA in 1955, based on new evidence, that the previous diagnosis of psychoneurosis “was clearly and unmistakably an error” and that “his true condition” is “chronic brain syndrome, associated with brain trauma, with neurotic reaction and convulsive disorder” (findings 28, 30), as well as the expert testimony submitted at the trial of this case. Plaintiff has unquestionably made a strong case in support of this theory, the adoption of which would settle without difficulty the line of duty issue. The theory relies strongly on certain abnormal electroencephalograms (EEG’s), which are graphic recordings made by an instrument that registers the voltages of the brain waves. On the other hand, by its expert testimony, defendant has similarly made out a strong case in support of the psychoneurosis diagnosis, with no organic brain damage. Defendant minimizes the significance of such EEG’s and contests the strong reliance which the YA. in changing its diagnosis, placed on them. Based on the voluminous record in this case and the controversial and uncertain nature of the brain damage and psychoneurosis fields herein involved, including the relationship between them, it cannot fairly be found that the findings of the Retiring, Review, and Correction Boards in this respect lack substantial support and are arbitrary.
The final issue between the parties pertains to the statute of limitations, plaintiff having been discharged in 1944 and filed his petition herein in 1958. This issue too is controlled by the (Japps case which held that when a case is reviewed by the Disability Review Board after the Secretary’s changed *234 administrative interpretation, the Secretary has not finally completed action on the case until his approval of the Review Board’s action. This did not occur in plaintiff’s case until June 7, 1956 (finding 32(b)). The court in the Capps case said that “Under these peculiar facts, we do not think plaintiff’s action is barred.” On this basis, plaintiff is entitled to recover from the date he would have received his disability retired pay in 1944 had the Retiring Board and the Secretary then found that his incapacity was incurred in line of duty, the amount of the recovery to be determined in accordance with Rule 38 (c).
PINDINGS OP PACT
1. Plaintiff was bom on December 2, 1920, at Watervliet, New York, where he also attended elementary and high school. During his schooldays, he frequently sought employment and worked on farms, golf courses, as an undertaker’s helper, and in florist establishments. At intervals he left high school in order to work. As a result he completed only 2 years of high school work over a 3-year period. However, he passed all of his courses, was on the student council, and engaged in various forms of athletics. In 1938, after completing said 2 years of high school work, he left school to do full-time work, principally with florists, but also for the Western Electric Company. He was a good, industrious, worker who got along well with his employers and people generally.
During this period of his life, plaintiff suffered no illnesses other than the usual childhood diseases, and exhibited no abnormal nervous traits or symptoms. He appeared to be well adjusted at home, school and work.
2. Plaintiff enlisted in the New York National Guard on November 6, 1939. His physical examination in connection with such enlistment showed him to be mentally and physically qualified. He was promoted to private, first class, on June 6, 1940. On October 15, 1940, he was inducted into active Federal service in the Army of the United States. His physical examination of October 16, 1940, conducted by a three-member Medical Corps Board in connection with such *235 induction, also showed him to be mentally and physically qualified for active military service.[1] On November 16,1940, he was promoted to corporal. He served in such active Federal service until October 22,1941, when he was relieved from active duty and transferred to inactive State Control. His Certificate of Service covering said period of his active Federal service states “Character: Excellent”, and his final physical examination in connection with the termination of his Federal service showed no disabilities or defects.
3. Plaintiff was recalled to active duty as a corporal in the Army of the United States on J anuary 19,1942, at which time he was 21 years old. He was assigned to the Air Corps and sent to Camp Upton, New York. After being found “mentally, morally and physically qualified,” plaintiff was, on February 20, 1942, appointed as an aviation cadet and was ordered to Kelly Field, Texas, for training.
4. From April 1 to April 30, 1942, plaintiff took a pilot preflight course at Kelly Field, Texas, and completed it successfully. He was then sent to Parks Air College, East St. Louis, Missouri, for primary pilot training, where he remained until June 9, 1942. However, he did not successfully complete the pilot’s course. Nevertheless, he received a “satisfactory” character rating and an “excellent” efficiency rating. He lost only one day due to a minor illness. On June 12,1942, he was sent to Ellington Field, Texas, for pre-flight instruction as a bombardier, his course there commencing on August 10, 1942. On that day, he passed a physical examination in which he was found to be “Qualified.” He completed the course satisfactorily on October 15, 1942. While at this station, he lost no time by reason of illness. He was then sent to the Army Air Forces Bombardier School at Big Springs, Texas, where he commenced the bombardier course on October 16,1942. On October 23,1942, he passed another “Physical Examination for Flying,” and was found physically qualified for flying duty by the three doctors who conducted the examination. Another physical examination on December 30, 1942, also showed no defects. On J anuary 4, 1943, he completed the bombardier course successfully, *236 and was rated “Master Class Bombardier” (being tbe middle of tbe three bombardier ratings), as a result of a general average of 81.9 in bis ground school subjects (70% being passing). Plaintiff had over 97 bombing hours to his credit, and had effected 120 bomb releases. He lost no time at this station by reason of illness.
5. As a result of his successful completion on January 4, 1943, of the course at the Bombardier School at Big Springs, Texas, plaintiff became eligible for a commission as a second lieutenant. On January 6, 1943, plaintiff received an honorable discharge as an aviation cadet in the Army Air Forces, Army of the United States, in order to accept a commission. His certificate of discharge stated that his physical condition when discharged was “Good,” his character was “Excellent,” and that he “Lost no time under AW 107.” The following day, January 7, 1943, plaintiff was appointed a second lieutenant, Army of the United States.
6. On January 18, 1943, plaintiff was sent to a station at Las Vegas, Nevada, where, on March 1, 1943, he completed successfully a flexible gunnery course. Thereafter, and up to June 3,1943, plaintiff, as a bombardier, was in various stations for short periods, receiving excellent efficiency ratings.
7. On June 3, 1943, while stationed at Fort George Wright, Spokane, Washington, plaintiff underwent a tonsillectomy. Also, on June 23, 1943, plaintiff underwent an appendectomy while stationed at Grenier Field, New Hampshire. Plaintiff’s condition was diagnosed as “Appendicitis, acute, suppurative.” Plaintiff had been admitted to the hospital at 2 a.m., June 22, suffering from abdominal pain and nausea. Plaintiff had an uneventful recovery and was out of bed the day following surgery. The hospital records indicate that plaintiff registered “no complaints” and plaintiff was discharged on June 29,1943. In July, plaintiff was transferred to the Army Air Base at Ephrata, Washington.
8. On July 22,1943, plaintiff, while at Ephrata, was on an assigned training mission as a crew member aboard an airplane. Upon the return of the airplane to its base, plaintiff was riding in the nose section when, during the landing, he was thrown from where he was sitting and hit his head. A *237 bleeding scalp laceration resulted on tlie right side of Ms head, as a result of which plaintiff sought medical aid at the infirmary of his bombardier group at the Base, where he was admitted at 10:30 a.m. However, the infirmary immediately transferred him to the hospital (“Soap Lake”) at the Base for “observation for possible intracranial injury,” where he was admitted at 11 a.m. Upon examination, the hospital doctor (Captain Austin) noted “no unconsciousness, no vomiting or other signs of brain injury.” His record also noted: “Complete physical examination is negative except for the following: Small, % inch cut on rt. side of vertex of head. No positive neurological signs.” He described the lacerated scalp condition as “mild.” There is no record of any other member of the airplane’s crew being hurt in any way during the landing, nor is there any record of any damage to the aircraft.
The following day, July 23, an examination of plaintiff indicated “No evidence of nerve or head injury. No complaints.” He was given general care and ate his meals in the mess hall. The following day, July 24, 1943, plaintiff was similarly given general care and attended mess hall. He was discharged from the hospital “to duty” that day with the following “final diagnosis”:
WOUND, LACERATED, scalp, to right of vertex, mild, bumped head accidentally incurred while landing a plane, Army Air Base, Ephrata, Washington * * * on 22 July 1943.
Plaintiff returned to the performance of his duties, and on or about August 3,1943, plaintiff was transferred from Ephrata to the Army Air Base at Kearney, Nebraska.
At the Kearney Base, plaintiff’s duties were extremely arduous, involving flying missions at all hours of the day and night. Plaintiff was engaged in a program of preparing student bombardiers for combat duty in the shortest possible time. The B-l7’s, which were employed for such training, were very noisy, vibrating, combat planes, and plaintiff frequently returned from missions greatly fatigued.
9. (a) While stationed at Kearney, plaintiff suffered an episode of 4 or 5 days of a condition which he felt was a *238 cold. On the morning of September 19, 1943, he awoke feeling feverish and with a pain behind his eyes. He was admitted to the Army Air Base Hospital at Kearney, his temperature upon admission being 101 degrees. When later examined that day, 'he had a temperature of 102 degrees and complained of general weakness, multiple joint pains, coughing, and chest pains. The preliminary diagnosis or impression of the doctor (Captain Pinne) was that plaintiff had influenza or pneumonia. The following day, X-rays were taken of his chest to check on pneumonia, but the report showed “the thoracic cage to be normal in contour” and, after other comments, the doctor (Major Hollweg) indicated his “Impression” to be that plaintiff had “an upper respiratory infection.”
(b) While in the hospital, plaintiff complained of difficulty in breathing, pain in his chest, a throbbing head, diplopia (double vision) and amblyopia (blindness). On September 21,1943, he tol'd a doctor (Pinne) that while at Ephrata he had been struck on his head by the nose gun of a plane in an airplane landing accident, that a considerable hemorrhage resulted, that as a result he had lost consciousness for an unknown length of time, that the pupils of his eyes had lost their accommodation to light, that for 5 days after the accident he had experienced nausea, blurred vision, and headaches, and that thereafter he had intermittent periods of morning headaches, double vision, and blurred vision.[2] Thereupon, the doctor noted that plaintiff “has just volunteered information about his visual sensations” and that “It has been necessary to reverse the whole history. Much diagnostic work now must be done.”
(c) Thereafter, various examinations of plaintiff were made. On September 21, X-rays of plaintiff’s skull were taken to check on the possibility of a skull fracture, but the results of the X-rays were reported as follows:
X-Ray examination of the skull in the A. P. and right lateral projection reveals the skull to be normal in character and shows no evidence of skull fracture.
On September 22, plaintiff was given an eye examination. *239 However, tbe ophthalmologist, after finding various factors “negative” and “clear”, and “no hemorrhage”, found “There are no definite indications of intracranial pressure in the fundi.” He was also given a neurological examination that day. It was found that he was “confused” and “disoriented”, that his memory was impaired, and that his “emotional reaction” was “poor.” On these findings and the history of his condition after the blow to his head as given by plaintiff, a diagnosis of “post cerebral concussion syndrome” or “sub-dural hematoma” was made, with recommendation of a skull X-ray and a spinal fluid analysis. However, the results of the skull X-rays already taken Showed no fracture, as set forth above, and a lumbar puncture was not done as it was felt advisable to transfer plaintiff to a general hospital for further observation and treatment.
On September 23, routine chest X-rays were taken but the report showed “Heart and lungs are essentially negative.” On that day, plaintiff was transferred, unimproved, to Fitz-simons Army General Hospital at Denver, Colorado, with a final diagnosis of:
1. Observation for subdural hematoma.
2. Nasopharyngitis, [inflammation of the nose and throat] catarrhal, [mucus and secretions] acute, severe.
10. (a) Plaintiff was admitted to the Fitzsimons Army General Hospital at Denver, Colorado, on September 23, 1943, and remained there until February 12, 1944, a period of over áy2 months. Although admitted in a wheel chair, he was, from the first day of his admission, an ambulatory patient.
(b) On the day of his admission, a doctor (name not indicated) interviewed plaintiff for the purpose of arriving at a “working diagnosis or impression” and indicating the laboratory tests and special examinations that were to be made. A form, labeled “Initial Summary, Working Diagnosis, Contemplated Laboratory Tests, and Consultations,” which the doctor filled out after the interview shows that plaintiff informed the doctor that plaintiff was well until he struck his head in the airplane on July 22, after which he had double *240 vision, his head felt “foggy”, and it appeared to him that people talking to him were mumbling, so that statements had fco be repeated to him several times; that while he was in the Ephrata (“Soap Lake”) hospital (finding 8), “for 4 or 5 days” he suffered a “throbbing headache over the entire head”;[3] that these headaches continued after his discharge from the hospital, and that he was becoming absentminded; that he was admitted to the hospital at Kearney (finding 9) because of a cold, but thereafter his headache became worse and he was becoming dizzy and weak; and that on September 21, for approximately an hour “he saw everything double.”
On the basis of the information given to him by plaintiff, the doctor’s “working diagnosis or impression” was “cortical adhesions.” He recommended various tests and examinations, including lung and skull X-rays and a spinal tap.
On the same day, plaintiff was given a neurological examination, the doctor’s (Lt. Chobian) diagnosis again being “cortical adhesions,” and his recommendations as to further tests and examinations being the same as set forth above, except that he also recommended an encephalogram.
11. (a) The following day, September 24,1943, as well as on September 28, spinal punctures were performed on plaintiff. However, the spinal fluid was normal. On October 6, to explore the possibility of a brain tumor or an intracranial lesion, an air encephalogram operation was conducted under general anesthesia, in which spinal fluid and fluid surrounding the brain was removed, air injected into the cavities of the brain and X-rays then taken of the skull (the air appearing as a shadow on the X-ray and outlining the surface structure and shape of the inner cavities), but this test too indicated no such tumor or lesion, and was interpreted as being normal. The following day, October 7, plaintiff complained of a severe headache, and the next night, October 8, plaintiff suffered what was described as a “convulsive seizure” involving his entire body which lasted one hour. There was no loss of consciousness during this seizure. After this episode, the attending doctor’s (Captain Cam *241 eron) “impression” was still “cortical adhesions,” and this diagnosis was maintained for the rest of the month, of October. On October 26,1943, the attending physician (Captain Cameron), in his “Progress Notes” summarized plaintiff’s case thus far as follows:
* * * Patient has been under observation since 23 Sept. 43. Encephalograms had shown no subdural hema-toma, spinal fluid is entirely normal and neurological examination reveals no localizing signs. On one occasion * * * he had an attack of “grand mal” (epilepsy) and during the past few days he says that he had had a headache and at times feels like he is going to have another seizure. He has been on luminal daily and has been ambulatory and feeling good, except for the headache and the fear of recurrence of seizures. Believe he has organic brain disease, post traumatic. NP consultation asked and EEG requested prior to final disposition.
On that same day, plaintiff had a second episode which was again described as a “convulsive seizure” which lasted 30 minutes, and following it, the attending physician requested the neuropsychiatric consultation referred to in his above quoted note, stating that the consultation was “requested because of post traumatic grand mal seizures. EEG [electroencephalogram] [4] desired and NP [neuropsychiatric] status determined prior to final disposition”, and that his “provisional diagnosis” was “Organic brain disease, post traumatic.”
On October 28, 1943, an electroencephalogram was taken “to determine possible epilepsy.” The findings were: “Normal 10 per second alpha slightly disrupted on hyperventilation”, and the conclusion was “Normal, nonepileptic cortex.” It was interpreted as indicating the absence of brain damage or injury.
(b) On November 2,1943, the neuropsychiatric consultation previously requested, as set forth above, was had, the ultimate diagnosis as a result thereof being “Psychoneurosis, hysteria, severe.” After plaintiff related to the psychiatrist (Lt. Col. Barnacle) his past history and the onset of his *242 symptoms after he struck his head during the airplane landing, plaintiff was subjected to a “direct examination”, which the doctor, in his report, stated:
* * * reveals an excitable, talkative, emotionally unstable individual who shows hysterical dissociation, hy-persuggestibility and hypochondriasis. He describes his complaints with emphasis and the superlative degree. He shows signs of vaso-motor instability and biological components of tension. He is dramatic in demeanor and talk. He is an. adolescent, immature individual who at the present time is quite apprehensive and fearful, particularly about his physical state. He is obsessed with the thought that he might have a brain tumor. Sen-sorium is within normal limits. [Patient’s mental state does not evidence impairment of comprehension.] Rorschach [a test showing responses the patient makes to color details on cards] reveals a typical psychoneurosis with color shock, dissociation and impulsivity.
The report also stated that the neurological examination given to him:
* * * reveals numbness and hysterical hypoesthesia to touch and pain over the left face and head to the mid-line ; left chest and shoulder to the midline and stocking numbness [impaired sensation to touch in foot] and hypoesthesia over the right lower extremity from the hips down. Suppressed reflexia throughout. Hysterical ataxia [disturbance of balance not due to physical illness] on Rhomberg test [patient standing with feet together, with eyes closed] to the left; excessive perspiration ; & cold, wet hands and feet [indicative of a tense, apprehensive person].
The report went on to question the previous conclusion that plaintiff had suffered a “generalized convulsion” on October 8, since, among other things, plaintiff had not been unconscious and “convulsive seizures of one hour’s duration are questionable * * *.” In support of the psychoneurosis diagnosis, the doctor noted that the EEGr studies “were negative”, the spinal fluid examinations, the skull X-rays and “visual fields” were all normal, and the air encephalogram “reveals no definite pathology.”
As to whether plaintiff’s condition was incurred in line of duty, the doctor reported: “Undetermined. First Symptoms *243 manifest July 23, 1943” [the day after plaintiff struck his head] .[5]
The psychiatrist closed his report by recommending that information be obtained concerning plaintiff’s “efficiency, nervous traits, character and behavior” from his commanding officers, that information be obtained from the Ephrata hospital concerning plaintiff’s injury, and that more information be obtained “concerning the questionable convulsion” of October 8. Further, he requested a “Ked Cross Social History.”
(c) Thereafter, for several days, plaintiff complained of nervousness and general poor health. The attending doctor (Cameron) noted that “there is a large amount of hypo-chondriasis”, and that plaintiff:
has occasionally complained of feeling as if he were going to have another attack but none have developed. The hysterical nature of his complaints is becoming more evident; says that he is nervous, feels “badly” every morning, and yet is able to be up and about and engage in normal activity throughout most of the day.
On November 24,1943, plaintiff was transferred to a different part of the hospital for further investigation. The final “Note” by the above-mentioned attending doctor stated:
* * * Nothing has appeared to indicate any organic brain disease, except the so-called convulsion, the nature of which is still in question. However, patient’s course in the hospital and all studies indicate that he has a definite hysteria. Neurosurgical clearance is given. The remaining problem to be solved is whether this is LOD Yes or No. To be transferred to the Medical Service at Col. Barnacle’s request for further investigation.
Diagnosis: Psychoneurosis, hysteria, severe. LOD, undet.
The same day, plaintiff was examined by the new attending physician (Capt. Jones) who found him to be “quite talk *244 ative and noisy”, “tends to be boisterous in manner”, “tense and on tbe move constantly”, “nervous”, “reflexes sluggish throughout” and “feet and hands moist.” Based on these findings, as well as other results of the physical examination, the doctor’s “impression” as to plaintiff’s condition was “psychoneurosis, anxiety state, severe.”
12. (a) Pursuant to the psychiatrist’s recommendation, the hospital, in November and December 1943, sent letters to the commanding officers under whom plaintiff served inquiring about plaintiff’s “character, behaviour, sociability, efficiency, nervous manifestations, alcoholic habits, time off for sickness and such other data as would help in evaluating” plaintiff’s condition. However, none of the replies indicated that plaintiff had had any difficulties whatsoever. The Parks Air College where plaintiff served from May 1 to June 9,1942 (finding 4), reported that his “character rating was satisfactory and his efficiency rating as a soldier was excellent.” Ellington Field, Texas, where plaintiff thereafter served to October 15,1942 (finding 4) advised that he “made a good record while at the station”, that “there was no evidence of any undesirable traits, such as alcoholic habits, nor was his training held up at any time on account of illness”, that “he demonstrated good qualities of per-sistency” and that he was “considered a capable soldier who handled himself and his problems in an excellent manner, consistent with army regulations and discipline.” The Bombardier School at Big Springs, Texas, where plaintiff served from October 16,1942 to January 7,1943 (findings 4, 5) reported that he had not been ill at any time while stationed there.
(b) The “Bed Cross Social History”, hereinabove referred to, consisted merely of a report of an interview on November 19, 1943, by one H. A. Nirenberg with plaintiff’s mother who stated that, prior to entry into the service, plaintiff had no difficulties and was always well adjusted at home, school, and work.
13. On January 3, 1944, after the replies and report referred to in finding 12 had been received, plaintiff was again interviewed and examined by another psychiatrist at the *245 hospital (Dr. Barbato) who was the Chief of the Hospital’s Neuropsychiatric Section. As set forth in the doctor’s report of the interview, plaintiff stated that while attending Bombardier School at Big Springs, Texas, (finding 4) he:
experienced considerable conflict, anxiety and had numerous qualms over the prospect of having to bomb women and children. He remained indecisive on this point for some time and only later after talking to a veteran of World War I, who told him he should not feel this way as the children they spared in World War I were now the ones we were fighting, he changed his viewpoint immediately and he now states that if his target were a church he would not hesitate to bomb it.
This doctor’s diagnosis was also “Psychoneurosis, hysteria, severe”, and as to whether it was incurred in line of duty, he reported:
No because there were manifestations of emotional instability with anxiety, tension and indecision prior to entering on active duty, while patient was attending bombardier’s school as an air cadet. Diagnosis was first made Nov. 2, 1943 at FGH [Fitzsimons General Hospital].[6]
His recommendation was that “This Officer should appear before an Officers’ Betirement Board with view to separation from the Military Service.”
14. On January 6, 1944, plaintiff appeared at the hospital before a Disposition Board composed of three officers of the Medical Corps. After reviewing plaintiff’s medical record, including plaintiff’s statement of his conflict and anxiety over bombing women and children (which was the only symptom prior to service as an officer referred to by the Board), the Board unanimously arrived at the following diagnosis:
1. Psychoneurosis, hysteria, severe, cause undetermined.
*246 2. Pes planus, 2d degree, bilateral, nonsymptomatic, cause undetermined.
As to whether these conditions were incurred in line of duty, the Board found:
NO. Existed prior to active duty as an officer**
The Board stated its opinion to be that plaintiff was “physically disqualified for active military duty,” and recommended that plaintiff “be ordered before an Army Retiring Board with a view to retirement from the military service.”
15. On January 30, 1944, plaintiff was physically examined by two doctors (Dr. Grow and Dr. Barbato) in connection with his proposed appearance before a Retiring Board. One of the doctors (Dr. Barbato) was the Chief of the Neuropsychiatric Section who had examined plaintiff on January 3, 1944 (finding 13) and to whom plaintiff first related his anxiety about bombing women and children. As noted this doctor had then diagnosed plaintiff’s condition as “psychoneurosis, hysteria, severe” and had recommended plaintiff’s appearance before a retirement board (finding 13). After reporting, among other things, that plaintiff’s electroencephalogram was normal, the doctors diagnosed plaintiff’s condition as “psychoneurosis, hysteria, severe, (disabling).” They stated that plaintiff was “permanently incapacitated for active service” and recommended retirement.
16. On February 1, 1944, plaintiff appeared before an Army Retiring Board which was convened at the Fitzsimons General Hospital. The Board consisted of five officers, two of whom were doctors. Plaintiff was not represented by counsel. Plaintiff testified he wished to retire from the service and that he understood, on the basis of what the doctors told him, the nature of his disability to be psychoneurosis. Plaintiff had been furnished a copy of the report of his physical examination of January 30, 1944 (finding 15). The two doctors who had examined plaintiff on January 30,1944 (finding 15) then testified. They read the two psychiatric reports from the examinations of plaintiff on November 2,1943 (finding 11(b)) and January 3,1944 (finding 13). They also testified that plaintiff was incapacitated *247 for active service; that the incapacity was permanent; that he was not capable of performing limited service; that the cause of the incapacity was “psychoneurosis, hysteria, severe”; and that “the date of origin is undetermined. It existed prior to active duty on 7 January 1943, as an officer. The symptoms were first manifested in the Army as an air cadet in Big Springs, from October to January, 1943. It was first manifested as an officer on July 21,1943, at Ephrata, Washington. The diagnosis was first determined 2 November 1943, at Fitzsimons General Hospital.” They further testified that neither the incapacity nor the cause of it was an incident of the service and that it had not been aggravated by military service; that the “airplane accident was the thing which was responsible for the manifestation of” his symptoms, but it did not “produce or cause” the type of condition plaintiff had, and that it was not, therefore, an incident of the service. To the question as to whether the “bump on the head had nothing to do with the present condition”, they answered:
No, sir, not as an etiological factor. We frequently find following a minor injury or even an illness or acute infection that psychoneurotic symptoms become manifest. That was purely a coincidence. The accident was exciting in character. Had the factors for the psychoneurosis not been present in this case, the injury he sustained would not have led to this train of symptoms.
Despite plaintiff’s earlier testimony that he wished to retire, he later testified that he felt too much emphasis was being placed on his expressed feelings at Bombardier School about bombing innocent women and children, since all the other cadets at the school had the same feelings; that he was then feeling “much better” and that, as to returning to flying service: “If the medical men feel I can go back to flying service, there would be nothing more pleasing. I feel I could go back * * * into flying. * *
Thereafter, the Board found that plaintiff was incapacitated for active service; that neither the incapacity nor the cause of it were the result of an incident of service; that the cause of the incapacity was “psychoneurosis, hysteria, severe (disabling) ”; and that the:
*248 incapacity originated at some unknown time prior to 7 January 1943, when this officer entered upon extended active duty; that the incapacity first manifested itself in the military service as an officer[7] on or about 22 July 1943; and that said incapacity is permanent.
It also found that no further hospitalization was required.
17. On February 9, 1944, plaintiff was ordered relieved from active duty as of March 23, 1944, “having been found physically incapacitated for active military service by an Army Ketiring Board.” On February 12, 1944, he was discharged from Fitzsimons General Hospital to terminal leave. On February 24,1944, the Surgeon General concurred in the findings of the Army Retiring Board, stating that plaintiff was not fit for limited service and recommending that he be discharged from the Army since he could not meet the minimum physical requirements for induction under the Selective Service Act. On March 23,1944, he was relieved from active duty and separated from the service for physical disability. On April 3,1944, the Secretary of War approved the findings of the Army Retiring Board, and, on the same day, also approved the recommendation of the Surgeon General. By letter of the same date, the Adjutant General by the following letter advised plaintiff he was not entitled to retirement pay:
1. The Secretary of War directs me to inform you that the findings of the Army Retiring Board convened in your case have been approved. It having been determined that your physical incapacity was not incurred in line of duty while on active duty as a commissioned officer, you are not entitled to retirement pay benefits under the Act of 3 April 1939.
*249 2. You are considered by the War Department to be permanently physically incapacitated for any type of active military service.
On April 8, 1944, plaintiff was honorably discharged from his commission “by reason of physical disqualification.”
18. On June 19,1944, plaintiff wrote to the Adjutant General requesting that he be returned to active duty “at the earliest possible date,” since he then considered himself “as capable of performing active military duty to include flying.” However, by letter of June 29, 1944, the Adjutant General replied as follows:
The receipt is acknowledged of your letter dated 19 June 1944 concerning reinstatement of your former commission.
You were honorably discharged from your commission as Second Lieutenant, Army of the United States by reason of a physical defect which is considered to be permanently disqualifying for any type of military service. Favorable action on your request for reappointment cannot, therefore, be taken.
Your continued interest and patriotic desire to serve are appreciated and it is regretted that a favorable reply is not possible.
19. Plaintiff thereafter applied to the Veterans’ Administration for compensation. On July 29,1944, he was granted a 10 percent disability rating for psychoneurosis, hysteria, the VA finding such disability to have been “incurred in service,” and to be “such as to cause definite and appreciable social and industrial incapacity.”
20. After his discharge from the Army, plaintiff opened his own florist shop, but this venture did not succeed. He then became employed by Montgomery Ward. This employment lasted only one month and plaintiff then became employed by General Electric, where he lost much time because of nausea and headaches. This position lasted 4 months. He then became employed as a salesman. While at the General Electric Company, plaintiff consulted the company doctor who referred him to a neurologist and the psychiatrist-in-chief (Dr. Barrerra) at the Albany Hospital, Albany, New York. Plaintiff, complaining of nervousness, head *250 aches, nausea, loss of appetite, weakness, inability to concentrate, pain in Ms chest and a cough, consulted tMs doctor on August 28,1944, and twice thereafter and, on October 7,1944, received a report from him. The report stated that a neurological examination showed plaintiff to be “within normal limits except for marked sweating of the hands and coldness of the extremities”; that both his cranial and spinal nerves were normal and that “there were no paralysis or abnormal movements of any kind.” The doctor then reported:
Psychiatrically the man was obviously under considerable tension. He feels that he was definitely unjustly treated in the decision of the Army Retirement Board in considering his disability as non-service connected, denied that any of the symptoms which have made him disabled for service were present prior to this accident. He presents no evidence of a psychosis, is well oriented as to space, time and person. He was obviously suffering from some anxiety and my examination would indicate that he is suffering from a rather severe psychoneurosis with anxiety and hysterical features.
I reviewed the summary of the findings of the hearing before the TJ.S. Retirement Board at which he was retired disabled from the service. It was my opinion from the review of the evidence presented that there was nothing to support the claim that the disability was non-service connected. If the story as given is true that the symptoms which he now presents dated from the onset of his accident I would feel it entirely justified to consider that the present rather severe psychoneurosis from which he is suffering was caused by Ms accident even though minor following which he had been hospitalized. The mere presence in his previous history of a few feelings such as fear of falling out of bed, etc. does not in any way indicate the existence of an active psychoneurosis before the date of his accident. Although he is managing to get along to a minor degree at his present work I feel that his active psychoneurosis at present is quite disabling.
On October 9, 1944, plaintiff, complaining of a constant headache, nausea and vomiting, went to the Veterans’ Administration Hospital at Castle Point, New York, and was given an out-patient examination. The physical examination was essentially normal. Plaintiff was also examined by *251 a neuropsychiatrist (Major Trevisano), who similarly reported that the “neurological findings are within normal limits.” [8] The ultimate diagnosis was “conversion hysteria,” and on November 13, 1944, his rating was, on the basis of said examination, continued.
21. On April 10, 1945, plaintiff requested a review by a Board of Review of the findings and action of the Retiring Board. On June 15, 1945, this request was granted and the case referred to the Secretary of War’s Disability Review Board for consideration. Plaintiff’s case was reviewed by such a Board at Washington, D.C. on July 17, 1945. The Board consisted of five officers, including two medical officers. Plaintiff did not appear personally but was represented by counsel, who submitted the Albany Hospital’s psychiatrist’s report, referred to in finding 20. However, after considering plaintiff’s previous hospital records, and the aforementioned report, the Board affirmed all the findings of the Army Retiring Board, as set forth in finding 16. The Board’s findings were approved by the Adjutant General on the following day, July 18,1945, and plaintiff was so notified by letter of July 21,1945.
22. On October 2,1945, plaintiff, after first unsuccessfully attempting to gain readmission to Fitzsimons General Hospital in Denver, Colorado, presented himself for examination at the Veterans’ Administration in Denver, complaining of -headaches, lack of sleep, pains throughout his right side and back. A neurological examination and orthopedic examination were essentially normal, and the neuropsychiatrist’s (Dr. Lazell) diagnosis was “Psychoneurosis, conversion hysteria.” Plaintiff applied to the Veterans’ Administration for an increase in his disability rating. Plaintiff’s application was granted and the rating increased from 10 percent (finding 19) to 30 percent “in view of the findings [of the Denver hospital] together with the fact that this veteran has not been able to hold any position for over approximately 4 months and during the past 18 months has had seven different positions.” The diagnosis was “Psychoneurosis, conversion hysteria.”
*252 23. On December 18, 1946, plaintiff was again examined by a Veterans’ Administration’s neuropsychiatrist (Dr. Kirth) at the Watervliet Arsenal who also diagnosed plaintiff’s condition as “psychoneurosis, conversion hysteria.” On the basis of this examination, plaintiff’s 30 percent rating was, on January 10, 1947, confirmed. However on re-examination on December 8, 1947, during which it was noted that plaintiff had had approximately 15 jobs in 3y2 years as well as periods of unemployment, but was then working as a florist and had also qualified, in 1946, for a private pilot’s license, plaintiff was found to be “in very good physical condition.” The doctor (Host) concluded that plaintiff had “developed a psychoneurotic action following an insignificant accident”, that his “symptoms of anxiety and somatization have largely receded and the patient is now operating on his native level which is largely one of immaturity and insecurity.” The diagnosis was “Psychoneurosis, anxiety and somatization reaction (poor sleep, irritability, headache)”, the disability then being described as “mild”, plaintiff’s “Predisposition” as “Moderately severe” and the “External Precipitating Stress” as “mild: insignificant training plane accident.” On the basis of this report, plaintiff’s disability was, on January 5, 1948, reduced to 10 percent, the Rating Board finding that plaintiff’s “condition has improved and now shows moderate manifestations of conversion hysteria.”
24. On March 8,1948, plaintiff, complaining of headaches and other pains, consulted privately a psychiatrist (Dr. Chap-nick) in Troy, New York, who had examined him on several occasions at the VA Regional Office in the Watervliet Arsenal. At this time, plaintiff had been steadily employed by a florist for approximately a year. This doctor, after giving plaintiff a psychiatric examination, concluded that plaintiff’s “history is very suggestive of a traumatic encephalopathy superimposed on a neurotic individual.” His diagnosis was: “Encephathy, traumatic and due to injury in left parietal region manifested by cephalalgia, irritability and numerous somatic complaints.” On January 12, 1949, plaintiff, complaining of a severe pain in his back, headache, and extreme nervousness, again consulted this doctor, who reported that plaintiff “seemed to be in obvious pain and was quite tense *253 and apprehensive.” On June 29, 1949, an electroencephalogram (hereinafter referred to as an EEG) was, at the request of VA, performed on plaintiff at Albany Hospital, which reported to VA on July 6, 1949, that the result was “Borderline”, the “Impression” being that it was “Compatible with minimal degree of encephalopathy.” However, on August 1,1949, the VA Eating Board confirmed and continued the 10 percent rating decision of January 5, 1948 (finding 23), the Board considering that the Albany Hospital EEG report of July 6, 1949, “warrants no change in prior decision.” Nevertheless, plaintiff’s VA rating was again considered the following month and on September 20, 1949, the Eating Board decided to defer the rating pending receipt of a new medical report, for which all necessary tests were authorized, and a complete review of all prior hospital and examination reports. The Board took this action “in view of clinical records of head injury” and “to determine if true encephalopathy existed and/or is now present.” Plaintiff was thereupon examined by a Board of three VA doctors (Drs. Kirk, Harris and Eockmore) on November 10, 1949, at Watervliet, New York. The Board conducted a general as well as a neuropsychiatric examination. After a psychiatric examination in which it was concluded that plaintiff “does not evidence any great tension or anxiety”, and a neurological examination which was “essentially negative”, the Board concluded, on November 14, 1949, that plaintiff:
* * * evidences no neurological findings of abnormality at this examination. EEG 2 months after accident was normal; EEG of July 1949 not conclusive evidence of brain damage.
DIAGNOSIS: Psychoneurosis, conversion reaction, chronic, severe with history of precipitating head injury without gross injury to brain, manifested by cephalalgia, vision and hearing disturbance, psychogenic gastrointestinal reaction.
Predisposition: Severe.
External Precipitating Stress: Mild.
Present Disability: Mild.
Competent.
Upon a review of this medical report, the VA Eating Board, on November 29, 1949, after noting that the report “shows *254 no gross brain damage, and the diagnosis of psychoneurosis, conversion reaction is maintained” with the disability being “considered as moderate in degree”, confirmed and continued the 10 percent rating of January 5, 1948 (finding 23).
25. (a) By memorandum dated December 29, 1950, to the Air Force Chief of Staff, the Assistant Secretary of the Air Force stated as follows:
I have this date changed the administrative interpretation of the Act of April 3, 1939, with reference to the determination of the line of duty status in cases of non-Regular Air Force officers and warrant officers, so that it will conform to the method authorized in cases of Regular Air Force officers.
My purpose in effecting this change is to rectify the inequitable precept which has resulted in the case of commissioned officers, warrant officers, and flight officers, who incurred injuries and disease while serving in a lower status, being denied the right of retirement in the officer status in which he became incapacitated. It is my intention that in cases where service has been continuous and where the cause of an individual disability originated during service in a warrant or enlisted capacity but where the actual incapacities occurred during commissioned or warrant service, that such incapacities shall be regarded as an incident of the officer’s service.
It is requested that necessary action be taken to inform all concerned of this change and to revise Air Force Regulation 14-10 accordingly.
The record contains no indication that plaintiff was ever advised by the Air Force of this change.
('b) On July 27, 1951, plaintiff’s case was, as a result of the above-mentioned memorandum, referred to the Air Force Disability Review Board. However, on August 8, 1951, the Board returned the case without action, except for informal study being given to the case by the Board’s medical officers.
26. Except for the reference to the Disability Review Board referred to in finding 25 (b), the record is silent with respect to plaintiff’s case during the approximately 3%-year interval from November 29, 1949, when plaintiff’s VA 10 percent disability rating on the basis of psychoneurosis was confirmed and maintained (finding 24), to March 24, 1953. *255 However, on the latter date, in connection with, what appears to have been a periodic review by VA of plaintiff’s disability rating following a medical examination on February 19, 1953, the Rating Board decreased plaintiff’s rating from 10 percent to 0 percent on the following facts:
Cited NP examination report reveals the veteran is a well developed individual with heavily calloused hands. He answers questions relevantly and coherently. He is completely oriented in all three spheres. Affect is appropriate. Insight is only partially present. He still resists any implication that his symptoms may be on an emotional basis. Intelligence, general knowledge and judgment are average. He is employed by Allegheny Ludlum Steel, Watervliet; monthly wages $200. He alleges one month loss of time last year.
27. (a) In the early part of 1954, plaintiff again consulted the psychiatrist (A. M. Chapnick of Troy, New York) referred to in finding 24 who had examined plaintiff at the VA Regional Office in the Watervliet Arsenal in 1948 and whom plaintiff had also consulted privately on March 8,1948. This doctor referred plaintiff to another doctor (Emerick Friedman) for the taking of an electroencephalogram (EEG). On March 3, 1954, an EEG report was submitted to the referring doctor. In plaintiff’s “History”, the report noted that, since his retirement, plaintiff had had constant headaches “with episodes of weakness of the right limbs”, that he suffered at times from “a crashing feeling in the head and humming in the ears”, that “intermittent visits and medications” at the VA “have not been beneficial”, and that plaintiff “has been unable to work for anyone but has run his own business as a wholesaler in gladiola bulbs.” After setting forth in technical terms the EEG results, the report concluded with the following:
Impression: This is an abnormal EEG. Non-specific type of diffuse disturbance. Such a condition is commensurate with toxic states or with residual effects of a severe concussion.
(b) Thereafter, on March 16, 1954, the referring doctor gave plaintiff a “To Whom It May Concern” statement. This statement, among other things, referred to an EEG *256 “which, was done at the Albany Hospital during the early part of 1948[9] and which was reported as being abnormal,” as well as to the abnormal EEG of March 3, 1954. It concludes with the statement:
* * * in view of the history of his complaints of persistent headaches and 2 abnormal electro encephalo-grams, the first one being done in 1948 and the latest on 3/3/54, it is my impression that Mr. Ludzinsky is suffering from a post-traumatic encephalopathy which is manifested by cephalalgia [headache], tinnitus [ringing in the ears] and vertigo [dizziness].
(c) On November 29, 1954, plaintiff also obtained from his family doctor (Dr. Charles A. Birmingham of Water-vliet, N.T.) a “To whom it may concern” statement, as follows:
I have known Joseph Ludzinski from childhood and up to the time he went into Army about 1940. He had the usual run of diseases and never during those years did I see or notice anything wrong with his nervous system. Certainly he never had any symptoms of psychoneurosis. I know his father and mother and grandfather ahead of him. I never saw any evidence of so called psychoneurosis among any of them.
(d) On February 22, 1955, plaintiff submitted an application to the Air Force Disability Review Board for a review of its previous findings (finding 21) and, specifically, a reversal of the previous finding that plaintiff’s disability was not incurred in line of duty. To his application, plaintiff attached the three documents set forth in subparagraphs (a), (b),and (c) hereof.
28. (a) On May 9, 1955, plaintiff, complaining of headache, neck and abdominal pain, and periodic transient attacks of blindness, was admitted to the Albany Veterans’ Administration Hospital. He was hospitalized and given various examinations and tests, including an EEG. As of said admittance date of May 9,1955, plaintiff’s VA disability rating was changed from 0 percent to 30 percent. An “Interim Summary” of plaintiff’s case prepared on May 24,1955, *257 by two VA doctors (Dr. P. A. Bothenberg and Dr. I. C. Funk), one of whom (Dr. Funk) was the Chief of the Hospital’s Neuropsychiatric Service, recited, under the heading “Mental Status”:
* * * He relates all the incidents regarding his trials and tribulations with the Medical Officers in the Army and the VA with infinite detail and almost everytime points out in a very efficient way, how the doctors are either wrong, stupid, dishonest or careless. He, himself, uses the phrase, “Fencing with the psychiatrist” and this is what he has been doing for years.
The summary notes that plaintiff:
seems to be only moderately incapacitated by his symptoms ; complains of getting the sharp pains in his head once or twice a day but they last only a few seconds and he usually resumes his work immediately. When he has headaches he usually lies down and takes aspirin and they go away within a half hour or so. His big battle appears to be with the Army Betirement Board and is at present opening his case in Washington once again.
The two doctors recommended “continued hospitalization for further tests, consultations and psychotherapy.”
(b) Subsequent to the above “Interim Summary” Beport, a report of the EEG, taken May 23, 1955, was submitted. The EEG was interpreted as being abnormal. Thereafter, plaintiff was examined by an attending neurologist at the hospital (Dr. Drislane), who, on the basis of plaintiff’s history, symptoms, and the EEG findings, including the EEG done at the Albany Hospital in 1949 (finding 24), which was also interpreted as being abnormal “with some slow wave in the right temporal area”, diagnosed plaintiff’s condition as “post-traumatic encephalopathy [injury to the brain following a blow to the head] with symptomatic convulsive disorder.” This neurologist concluded that plaintiff’s brain injury produced a scar which caused an electrical abnormality on the EEG’s. At this time the neurologist did not know of the EEG performed on plaintiff on March 3, 1954 (finding 27(a) (b)).
(c) On May 30, 1955, plaintiff still being hospitalized, plaintiff’s VA disability rating was changed from 30 percent to 100 percent.
*258 (d) By an “Addendum” dated June 6,1955, to the above-mentioned “Interim Summary”, the said Chief of the Neuropsychiatric Service (Dr. Funk) noted that plaintiff was receiving “continued psychotherapy” and that “the interviews continuously point to his fear of becoming helpless, paralyzed, which to him means death. Most of his difficulties seem to stem from remarks that have been made by doctors he has seen from time to time.”
Thereupon, as set forth in the “Addendum”, the previous VA diagnosis was, “on the basis of the EEG findings and the neurological consultation”, changed as follows:
DIAGNOSIS: 1. Chronic brain syndrome, associated with brain trauma, with neurotic reaction, manifested by headaches and symptomatic convulsive disorder.
External precipitating stress: Minor injury to head and subsequent traumatic experiences while in an Army Hospital.
Predisposition: None evident.
Degree of Psychiatric Impairment: Mild.
2. Scar, appendectomy, unchanged.
3. Scar, scalp, right vertex, unchanged.
PRESENT status of so [Service-Connected-] disability:
It is certified that the previous service-connected diagnosis of “conversion reaction” was clearly and unmistakably an error and that the present diagnosis represents his true condition. Diagnosis #2 and #3 unchanged.
29. By letter of June 16, 1955, plaintiff was notified that his application for a review of the findings of the Air Force Disability [Review Board (finding 27 (d)) had been denied because “you have not furnished sufficient evidence to warrant a rehearing of your case.” The letter went on to advise that plaintiff’s “only avenue in applying for disability benefits” was to “make application to the Air Force Board for Correction of Military Records.”
30. (a) On June 27, 1955, the Veterans’ Administration Rating Board made the following findings:
* * * The attending neurologist made the diagnosis of post-traumatic encephalopathy with symptomatic convulsive disorder, on the basis of the history, symptoms and EEG findings. The Chief, NP service certifies that *259 tbe previous service connected diagnosis of conversion reaction was clearly and unmistakably in error and that tbe diagnosis of chronic brain syndrome associated with brain trauma represents his true condition.
The previous diagnosis of conversion reaction is changed] to chronic brain syndrome associated with brain trauma on new and material evidence * * *.
(b) On June 28, 1955, plaintiff was discharged from the Albany VA Hospital and on June 29, 1955, plaintiff’s disability rating was changed by the VA Eating Board from 100 percent to 30 percent, plaintiff’s condition being evaluated as “Chr. Brain Syndrome Asso. with brain trauma, with neurotic reaction and convulsive disorder.”
31. On July 5, 1955, plaintiff applied to the Air Force Board for the Correction of Military Eecords to show his retirement “by reason of residuals of an organic head injury incurred during service July 22, 1913 at Ephrata, Washington rather than to have been separated by reason of a functional disability.” Plaintiff referred to the change in diagnosis by the Veterans’ Administration. On August 25, the Correction Board requested the Surgeon General’s “opinion for the guidance of” the Board, “indicating what action appears appropriate.” By memorandum of November 16, 1955, the Office of the Surgeon General advised that the Eetiring Board in 1944 found plaintiff’s incapacity “EPTS [existed prior to service] to his duty as an officer and he was separated without retirement pay benefits”, that the Air Force Disability Eeview Board refused to review the case in June 1955 (finding 29) and that:
In studying this case at the present time, it is felt that this case still should be considered by the Air Force Disability Eeview Board prior to consideration by the Board for Correction of Military Eecords. Consideration should be given in view of the new interpretation of the Act of 3 April 1939 as outlined in Memorandum, Assistant Secretary of the Air Force, 29 December 1950, Subject: “Disability Eetirement of Officers Who Incurred Disability While Serving in Warrant or Enlisted Service. (Finding 25.)
As a result, on November 30, 1955, the Air Force Board for the Correction of Military Eecords returned plaintiff’s case to the Disability Eeview Board for consideration by that *260 Board. On February 7, 1956, such Board decided it would reconsider the case “on the basis of new evidence”, and took steps to obtain copies of all the VA medical examinations. Plaintiff was notified of this decision by letter of April 5, 1956.
32. (a) On May 7,1956, plaintiff’s case came before the Air Force Disability Beview Board in Washington, D.C. Plaintiff appeared with an attorney and testified, plaintiff being the sole witness. Plaintiff’s counsel contended that plaintiff should receive retirement pay benefits on the following grounds:
(1) The conclusion that the disability existed prior to commissioned service was based upon plaintiff’s fears and indecision, expressed while an aviation cadet, about bombing women and children, which was described as the first manifestation of plaintiff’s illness. Counsel argued this was a natural, not an abnormal, feeling, and that there was, therefore, an insufficient basis upon which to conclude that plaintiff’s neuropsychiatric condition existed prior to his commissioned service; (2) In any event, even if such fears and indecision be considered as the actual first manifestation of his illness, as the Retiring Board held, the Assistant Secretary of the Air Force’s memorandum of December 29,1950, changing the administrative interpretation of the Act of April 3, 1939, controls plaintiff’s case and would require a finding that the incapacity was an incident of service; (3) The Retiring Board never considered the question of aggravation, so that even if plaintiff’s condition was considered one that existed from enlisted service, his head injury while a commissioned officer permanently aggravated it; (4) The new evidence obtained, and the new findings made, by the VA as to the diagnosis of plaintiff’s illness show that plaintiff’s condition had its onset as a result of an injury to plaintiff’s head while in commissioned service.
However, the Board, after prefacing its findings with the following “Discussion”:
Subject was hospitalized and underwent thorough medical study in the Fitzsimons Army (then General) Hospital following the accident to which he attributes the disability which resulted in his discharge from military service.
*261 The Army Keview Board [Retiring] found that the diagnosis of psychoneurosis, hysteria, severe, had originated prior to extended active duty. The clinical history supports the opinion that the defect actually originated prior to military service.
Recent findings by VA medical authorities, submitted by subject, include a stated finding of an EEG tracing of a pattern compatible with the presence of organic brain damage. It is not the belief of this Board that a laboratory test such as an EEG, however carefully performed and interpreted, of itself constitutes sufficient evidence upon which to base a reversal of all previously established clinical and laboratory diagnostic results. It is likewise evident that the presence of organic brain damage at this time, and the existence of the original psychoneurosis, would not necessarily prove mutually exclusive.
made the following “Findings”:
1. Former 2d. Lt. Joseph Chludzinski in April 1944 was permanently incapacitated for active military service.
2. Said incapacity was psychoneurosis, hysteria, severe.
3. The date of origin of the incapacitating defect was prior to entry into military service.
4. Said incapacity was not an incident of service.
5. The incapacitating defect had not been aggravated by military service.
6. The administrative action of the Secretary of War on 3 Apr. 44 in approving the findings of the Army Retiring Board convened at Fitzsimons Army Hospital, Denver, Colorado, on 1 Feb. 44 should be affirmed as amended.
The Board therefore concluded that plaintiff was not “entitled to be certified for retirement pay benefits.”
The aforesaid findings were the same as the Retiring Board’s findings except (1) the Retiring Board’s finding that plaintiff’s incapacity “originated at some unknown time prior to 7 January 1943, when this officer entered upon extended active duty”, was changed to “the date of origin of the incapacitating defect was prior to entry into military service”, and (2) an additional finding was made with respect to aggravation. There was no new evidence introduced before the Board with respect to the finding that the origin *262 of plaintiff’s incapacitating defect antedated his military service or the finding that such defect had not been aggravated by military service. Excluding plaintiff’s own oral testimony, the only new evidence before the Board of a medical character was that submitted in support of the application for review and the change in diagnosis of the VA.
(b) The Board’s findings and recommendations were approved by the Secretary of the Air Force on June Y, 1956. On June 12, 1956, a letter was forwarded to plaintiff advising him that, based on a review of his case by the Air Force Disability Beview Board, he was not entitled to be certified for retirement pay benefits and that his application for a review of his case by the Air Force Board for Correction of Military Becords (finding 31) had been referred back to said Board.
(c) On July 6, 1956, the Air Force Board for the Correction of Military Becords considered plaintiff’s application, and determined that “No corrective action is indicated in this case.” There was no hearing held with respect to this action. Plaintiff was advised of this determination by letter of July 12, 1956, the letter stating that plaintiff had “not submitted sufficient evidence to establish a showing of probable error or injustice in this case.”
33. (a) By letter of February 18, 195Y, written on plaintiff’s behalf (by the Disabled American Veterans), the Air Force Board for the Correction of Military Becords was requested to grant a formal hearing and to give further consideration to plaintiff’s case. The letter contended that the change by the Disability Beview Board of the finding of the Army Betiring Board that plaintiff’s disability had its origin prior to January Y, 1943 (the date of entrance on duty as a commissioned officer), which was based on the “clinical history which showed that the first manifestations of the then diagnosed neuropsychiatric disability came about during the applicant’s enlisted service rather than his commissioned service”, to the finding “that the defect actually originated prior to military service”, violated the decision of this court “in the case of William T. Capps, Jr. (* * * decided January 31,1956).” It stated:
*263 * * * There is nothing in the clinical history or in the testimony rendered by the medical witnesses to the original Eetiring Board * * * that * * * was . indicative of a pre-existing neuropsychiatric disability. The Eetiring Board, however, did have evidence to indicate that the neuropsychiatric disability, originated during enlisted service. This evidence was in the form of clinical history and actual testimony from medical witnesses that “the symptoms were first manifested in the Army as an air cadet in Big Springs from October to January 1943.” This finding of fact was affirmed by the Army Disability Eeview Board in 1945 and was approved by the Secretary of the Army. The Eeview Board’s conclusion of law from the facts it had found was not final, however, because it was contrary to law as the Secretary of the Air Force later determined [in his memorandum of December 29, 1950].
(b) By letter of September 30,1957, the Air Force Board for the Correction of Military Eecords advised plaintiff it would grant him a hearing and consider his case.
34. (a) Plaintiff’s case was heard by the Air Force Board for the Correction of Military Eecords on December 11,1957. Plaintiff appeared only by counsel, who made substantially the same contentions as had been made before the Disability Eeview Board (finding 32(a)) and in the February 18,1957, application to the Correction Board (finding 33(a)), counsel emphasizing that there was no evidence that plaintiff’s condition, even if it be considered a psychoneurosis, existed prior to military service, and that the presumption as to service-connection should prevail. Counsel argued that “this case is more of a purely legal matter than it is a medical matter.” There was no testimony of any witnesses taken, the transcript of the hearing consisting only of argument of counsel and questioning by the Board.
(b) On December 18, 1957, the Board requested the Surgeon General to review the record and advise the Board “whether or not the incapacitating defect, whatever called, is incident to military service.”
(c) On January 9, 1958, the Surgeon General replied to the above request as follows:
1. The case of former Lt. Chludzinski, including the report of proceedings of the Disability Eeview Board, has been carefully reviewed. In the course of many ex- *264 animations and evaluations, be was variously considered to have a mental disorder of psychogenic origin, traumatic encephalopathy, and combinations of these. He is now receiving compensation from the Veterans Administration for a minimum rating of the diagnosis of traumatic encephalopathy. His occupational record is spotty, but he is apparently working successfully at present.
2. It is the opinion of the Surgeon General that the findings of the Air Force Disability Beview Board should be adhered to.
(d) On March 20, 1958, the Board, on the basis of plaintiff’s request, the transcript of the hearing, plaintiff’s Army and Air Force personnel records and his VA records, found:
18. Careful consideration has been given to the application with supporting documents, the argument of counsel and the evidence of record. It is shown that applicant was denied retirement pay benefits as an officer because it was held that his incapacity was not incurred while he was a commissioned officer. The army retiring board found that his incapacity was incurred sometime prior to commissioning and was first manifested while he was serving as an aviation cadet. The army retiring board was not confronted with the problem that was eventually resolved in 1950 to the effect that if the incapacity was incurred in enlisted status and service was continuous and the incapacity was determined while in officer status, the incapacity was incident to service for retirement pay purposes as an officer. In fact, until the case was reviewed by the Disability Be-view Board no finding had been made that the incapacity was incurred as an aviation cadet or existing prior to entrance on military service. Because it was held not to have been incurred in commissioned status does not require a finding that it was incurred in aviation cadet status. The Disability Beview Board found as a fact that it existed prior to entrance into military sendee. That finding did not change any finding of the army retiring board; it merely fixed with certainty a finding of the army retiring board to the effect that the incapacity existed sometime prior to commissioned status. In a word we reject the proposition that the rationale of the Capps case is determining of the present case.
19. Independent of the foregoing we have considered whether or not the incapacity is an incident of service. If over-emphasis has been placed on the “fish bone story” in this record such emphasis is not our doing. It arose *265 in a conclusion of counsel that it was a determining factor in the EPTS finding. Reference to it appears in the early Veterans Administration examinations. For about twelve years, up to 1955, there was universal agreement on the diagnosis of psychoneurosis, hysteria the only changes being those to reflect changes in psychiatric nomenclature for the same disorder. In 1955, the diagnosis was changed to Chronic brain syndrome, associated with brain trauma with neurotic reaction, manifested by headaches and symptomatic convulsive disorder. Both may be correct; neither one rules out the other. Nonetheless the symptom complex which resulted in a finding of incapacity were those of a psychoneurosis, hysteria. We conclude that the incapacity was as found by the Army Retiring Board, namely, Psychoneurosis, hysteria. A careful study of all the physical examination in and out of service demonstrates that applicant has been a life-long neurotic. The fear of bombing children, fear of choking on fish bones, and the fear of falling is not the whole story. The fact is that the physical and mental examination showed him to be an “excitable, talkative, emotionally unstable individual” who showed hysterical dissociation, hypersuggestibility and hypo-chondriasis. He described his complaints with emphasis. He showed signs of vaso-motor instability and the biological components of tension. He was a dramatic, immature individual obsessed with the idea that he had a brain tumor. The fear of bombing children was immediately relieved when it was pointed out to him that if they were not killed as children, they would grow up to fight us later on. It was not just fear of choking on fishbones. It was such an uncontrolled life-long phobia that even the thought or smell of fish would cause nausea and vomiting. We conclude, therefore, that the incapacitating defect existed prior to service and was not an incident of service.. The applicant has failed to demonstrate any error or injustice m his case.
It accordingly recommended that plaintiff’s application be denied. On the same day, the Assistant Secretary of the Air Force approved such recommendation and denied plaintiff’s application. Plaintiff was so advised by letter of March 24, 1958. On May 6, 1958, plaintiff’s petition herein was filed
35. Plaintiff’s symptoms (headache, dizziness, nausea, vomiting, insomnia, irritability, personality changes, seizures, tinnitus (ringing in the ears)) are consistent with a head or brain injury. If this is the true cause of plaintiff’s *266 condition, they can only be related to tbe injury to bis bead received during tbe airplane landing on July 22,1943, since tbe symptoms commenced shortly thereafter and there appears to be no record of any other head injury to which to relate such symptoms. However, the same symptoms are also consistent with a psychoneurotic condition without brain damage. They may, in some cases, be brought about by a minor head blow which causes no brain damage. While in some cases the symptoms may be related to brain damage and in others may be entirely psychological in origin, in many cases both factors may play a contributing role. Patients who had previously shown a normal adjustment to life may also develop post-traumatic symptoms, and this is so even in situations where the injury is not severe. However, they are more likely to occur in patients who had manifested neurotic symptoms before the injury. The desire to obtain compensation may serve to prolong such symptoms after they develop, or may even play a part in their development.
The evidence does not clearly and convincingly establish whether plaintiff’s condition is due to an organic brain injury, or to a psychoneurotic condition, or to both. The entire subject of the relation between head injury and mental disease is a highly controversial one in the medical world.
36. Army Regulation 40-1025, dated December 12, 1944, provided:

Par. 63 * * *.

b. Basic provision for determining line of duty. — A disease or injury, that a militarized person contracts or sustains, while in the active military service of the United States, will be presumed to have been incurred in line of duty, unless there is substantial evidence to show that such disease or injury—
$ ‡ ‡ $
(4) Existed prior to the individual’s current active service and was not aggravated by the service (g below).
*****
g. Existed prior to individuals current active service and was not aggravated by service (EPTS).
% # * if:
(2) Basic provision. — Irrespective of length of service, an Army, patient will be presumed to have been in sound condition upon entering active service, unless the *267 disease or injury, or the conditions which, brought about the disease, injury, or death, were noted on the patient’s physical examination upon entrance into the service, or unless clear and unmistakable evidence ((3) below) demonstrates that the injury or disease, or the conditions which caused the disease, injury, or death, though not noted, existed prior to the patient’s active service. Further, even if the existence of the condition prior to entering active service has been established, only specific findings of “natural progress” of the disease or injury, based on well-established medical principles, are able to overcome the presumption of service-aggravated ((4) below). This provision will serve as a basis for judging line of duty in all cases, on or after 7 December 1941, and before the termination of hostilities incident to the present war. (It will be borne in mind that in determining line of duty with respect to eligibility for retirement benefits, the incapacity, whether resulting from a condition incident to service, or from a condition that existed prior to service but aggravated by the service beyond the “natural progress” of the condition, must be permanent; that is, the incapacity caused by the condition must be such that the removal of the disability within a reasonable time is highly improbable; * * *
(3) Clear and u/nmistakable evidence. — Medical judgment alone, as distinguished from well-established medical principles, will not be considered sufficient to rebut the presumption of the patient’s sound condition at the time of his entrance into active military service. * * *
(4) Service-aggravated. — Any increase in disability during active service resulting from a condition that existed prior to active service will be presumed to have been service-aggravated, unless it can be proved otherwise on the bases of well-established medical principles. Medical or surgical treatment furnished during service for preexisting conditions does not of itself establish increase in disability; however? if such treatment was necessitated by increase in severity of preexisting conditions, then such disability will be considered as service-aggravated, unless the condition was improved by such treatment. * * *
(5) Psychiatric cases.
(a) In line of duty. — The following cases will be considered to be in line of duty irrespective of length of service:
‡ ‡ ^
2. Cases of * * * psychoneurosis occurring in individuals in whom predisposition to these diseases, but *268 not tbe actual disease itself, existed prior to entry into tbe service. Neurotic traits in themselves will not be regarded as necessarily indicating tbe presence of psychoneurosis or psychosis.
8. Psychiatric conditions occurring in individuals in whom such conditions existed prior to entry into the service, but where there is evidence to show that the disorder has been aggravated by the service. * * *
(b) Not in line of duty. — The following cases will be considered to be not in line of duty: cases of * * *. psychoneurosis where available evidence clearly indicates the existence of the disease prior to entry into the service, and that the disease was not aggravated by the service.
37. In 1949, the Medical Service, Joint Armed Forces, published, as a regulation, a booklet entitled “Nomenclature and Method of Recording Psychiatric Conditions”, which states in part as follows:
5. Psychoneurotic Disorders
This generic term refers to psychiatric disorders resulting from the exclusion from consciousness (i.e., repression) of powerful emotional charges, usually attached to certain infantile and childhood developmental experiences. Hereditary, constitutional organic situational, and cultural factors are involved, but the extent to which they are contributory to the particular disorder is difficult to determine. However, these factors should be carefully considered in evaluating “external precipitating stress” and “premorbid personality and predisposition” * * *. These repressed emotional charges, which may not be apparent without an extensive and deep investigation of the personality, may or may not be adequately controlled in the absence of external stress. Longitudinal (lifelong) studies of individuals with such disorders usually present evidence of periodic or constant maladjustment of varying degree. Special stress may make the symptomatic expressions of such disorders acute.
The chief characteristics of these disorders is “anxiety,” which may be either “free floating” and unbound (“anxiety reaction”), and directly felt and expressed, or it may be unconsciously and automatically controlled by the utilization of various psychological defense mechanisms (repression, conversion, displacement, etc.). In contrast to psychotics, patients with psychoneurotic disorders do not exhibit gross distortion or falsification of *269 external reality (delusions, hallucinations, illusions) and they do not present gross disorganization of the personality.
Anxiety in psychoneurotic disorders is a danger signal felt and perceived by the conscious portion of the_ personality (ego). Its origin may be a threat from within the personality — expressed by supercharged repressed emotions, including particularly such aggressive impulses as hostility and resentment — with or without stimulation from external situations, as loss of love or prestige, or threat of injury. The various ways in which the patient may attempt to handle this anxiety will result in the various types of reactions listed below.
*****
c. Conversion reaction. — This term is synonymous with “conversion hysteria.” Instead of being experienced consciously (either diffusely or displaced, as in phobias), the impulse causing the anxiety m conversion reaction is “converted” into functional symptoms in organs or parts of the body, mainly under voluntary control. Often, such reactions meet the immediate needs of the patient and are, therefore, associated with obvious “secondary gain.” * * *
38. There was, in 1945, in existence a manual prepared in the Surgeon General’s Office entitled “Manual for Officers in the Disposition and Retiring Board Branch of the Physical Standards Division of the Surgeon General’s Office” which provided in part as follows:
74. Psychoneurosis. Whei’e there is no history of the disease, treatment for a similar condition, or similar symptoms prior to EOD, and the condition is more than mild and has not improved after prolonged treatment or temporary limited service, the officer may be considered incapacitated for active service. Line of duty, Yes. Where the disease existed prior to EOD, and the condition is more than mild but no worse than his previous episodes prior to EOD, the officer may be found incapacitated. Line of duty, No. Where the disease existed only in a mild to moderate degree prior to EOD, and now has become severe with no improvement after prolonged treatment, the condition may be considered permanently aggravated by the military service. (An NP Consultation, SGO, is indicated). Where the disease existed prior to EOD and there has been aggravation by the service but the advancement is considered only situational, and if it is evident that it will be re *270 moved, witb reversion of the disorder to its previous degree of severity within a reasonable time, upon return to civilian life, the aggravation is not considered permanent (and the said incapacity will not be the result of an incident of service).
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover and judgment is entered to that effect with the amount of recovery to be determined in accordance with Rule 38 (c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on February 2, 1962, that judgment for plaintiff be entered for $23,501.37.

 At the 1956 hearing before the Review Board, plaintiff admitted that, in obtaining his automobile operator’s permit after his discharge from the Army, he had lied to the authorities about his condition. At the trial of this ease, plaintiff also in effect admitted deceiving the Federal officials about his condition when, also after his discharge, he obtained a private pilot’s license.

 The report of Ms physical examination showed that he had “2 degree flat feet” bnt it was followed with the notation “no disability.”

 None of the infirmary or hospital records at Ephrata hear out these alleged aftereffects of the blow.

 Actually, lie was in this hospital only 2 days (finding 8) and the records of this hospital do not show any such symptoms.

 The electroencephalograph Is a device for testing, by graphic recordings, the voltages of the brain waves.

 During the interview, plaintiff told the doctor, among other things, that “he has always had a fear of eating fish because he choked on a bone in childhood”, that he had a “fear of falling”, and that “he has always had great interest in the organs of the human being”, working “as an undertaker’s helper until he was 17 or 18.” However, none of these factors were here referred to by the psychiatrist as symptoms of the psychoneurosis, the psychiatrist instead, as set forth, referring to the symptoms after the blow to the head as being the “first symptoms manifest”

 Although plaintiff repeated to this psychiatrist the statements he made to the first psychiatrist, including the statements set forth in footnote 5, and In addition further stated that at the age of 16 he “witnessed an airplane accident at which time there were brains and other organs scattered about the wreckage” and that because of this accident he “became interested in embalming and became an undertaker’s helper”, none of such factors were here referred to by the psychiatrist as symptoms of the psychoneurosis, the psychiatrist instead, as set forth, referring only to plaintiff’s emotional instability while attending Bombardier School.

 At this time there was in. existence a War Department ruling that a disability suffered in commissioned service was not considered an incident of the commissioned service, entitling an officer to retirement pay, if it were incurred in enlisted service. In view of the evidence before the Retiring Board, and as set forth in footnotes 5 and 6, it is plain that the finding of the Board that plaintiff’s disability was not an incident of the service was based upon the testimony and the opinion of the medical witnesses that the first manifestations of emotional instability occurred while plaintiff was an air cadet, and that it “first manifested itself in the military service as an officer" shortly after the blow to his head. (Emphasis supplied.) There was no evidence before the Board indicating that plaintiff had a neurotic condition prior to enlisted service, nor did the psychiatrists so indicate (footnotes 5 and 6).

 During this examination, plaintiff erroneously informed the doctor that at Eitzsimons his “encephalograms showed epileptic cortex.”

 This date appears to be erroneous. The reference is unquestionably to the EEG referred to in finding 24 performed on June 29,1949.